**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

CARLOS RAYMOND WILLIAMS,     *

     Petitioner,

v.                                            *     2:08-CV-242-MEF
                                                    (WO)

STATE OF ALABAMA, *et al.*,     *

     Respondents.                 *


## PETITIONER'S RESPONSE TO RESPONDENT'S ANSWER OF MAY 23, 2008

     **COMES** now the Petitioner, by and through counsel of record, Robert Troy Teague, and in response to this Honorable Court's Order of June 2, 2008, does file this Response to the Respondent's Answer of May 23, 2008.

     The Petitioner substantially agrees with the procedural background as described in paragraphs one through six in the Respondent's Answer. The Petitioner strongly disagrees with paragraphs seven through eleven of the Respondent's Answer.

     Respondents have argued that this Petitioner is not entitled to relief under *28 U.S.C. §2254 (d)*. However, as this Court noted in its Order of June 2, 2008 *U.S.C. §2254 (d) (2)* gives this court the authority to grant relief where claims adjudicated on the merits by the state courts resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *28 U.S.C. § 2254(d) (2).*

1

The Petitioner in this case was charged with and convicted of unlawful possession of a controlled substance in violation of *Ala. Code §13A-12-212 (a) (1)* which provides:

> "(a) A person commits the crime of unlawful possession of controlled substance if:
>
>  (1) Except as otherwise authorized, he possesses a controlled substance enumerated in Schedules I through V."

"The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U. S. 419, 424 (1985). It is well settled law that the burden of proof lies with the State, not with the Defendant. This premise of law means that each and every element of the crime charged must be proven beyond a reasonable doubt. One of the elements the State had to prove at trial was that the putative cocaine was in fact a controlled substance. *Ala. Code §12-21-300* provides:

> "(a) In any criminal case, or juvenile or family court case which is of a criminal nature, the prosecuting authority may offer a certificate of analysis as described below, *in lieu of direct testimony*. The court shall receive as evidence the certificate of analysis from any of the following:
>
>  (1) A person performing an analysis or examination in any laboratory operated by the Alabama Department of Forensic Sciences or authorized by the department to conduct an analysis or examination of the type performed.
>
>  (2) A person performing an analysis or examination in any criminalistics laboratory established pursuant to federal law.

2

(b) To be admissible pursuant to this section, a certificate of analysis shall contain all of the following:

(1) The date and time the evidence was delivered to the facility.

(2) The name of the person making the delivery, and the name of the person receiving the delivery.

(3) A brief description of the evidence.

(4) The type of examination or analysis requested.

(5) The name of the person making the examination or analysis.

(6) The date or dates of the examination or analysis.

(7) The results of the examination or analysis.

The certificate of analysis shall give the name and address of the facility in which the examination or analysis was made, and it shall be signed by and sworn to as true and correct, under penalty of law, by the person making the examination or analysis."

This statute gives the prosecutor two options, either provide direct testimony from a qualified expert to the fact finding body that the putative controlled substance is in fact a controlled substance or introduce a forensic certificate of analysis which conforms with the requirements of *Ala. Code §12-21-300.* As acknowledged in the Respondent's Answer, Paragraph three, the Alabama Supreme Court found that the certificate of analysis introduced at trial over the objection of Petitioner's trial counsel was improper due to the fact it was neither signed nor notarized, although the Alabama Supreme Court found that the improper admission of this certificate of analysis was harmless error.

It is the finding of harmless error that this Petitioner submits with all due respect to this court that qualifies him for habeas relief under *28 U.S.C. § 2254(d) (2)*. The Petitioner believes that the Alabama Supreme Court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings. No direct testimony was presented at trial as to the pharmacology of the putative controlled substance. While there were referrals to the substance being "crack" there was never one single witness who was qualified as an expert to testify to the pharmacology of this putative substance and, as determined by the Alabama Supreme Court, the certificate of analysis that was tendered was admitted improperly and was non conforming with *Ala. Code §12-21-300*. The obvious intent of the Alabama Legislature that codified *Ala. Code §12-21-300* was that either a properly admitted statutorily conforming forensic certificate of analysis would be introduced at trial or that there would be direct testimony that the putative substance was a controlled substance that is enumerated in Schedules I through V. Since neither was done, it is an unreasonable determination of the fact that the putative substance was proven to be a controlled substance enumerated in Schedules I through V in light of the evidence, or lack thereof, presented in the State court proceeding.

## CONCLUSION

This Petitioner objected at the very moment that the certificate of analysis was presented to the trial court for admission, renewed his objections, asked for a standing objection to all testimony based on the disputed certificate of analysis

(See Petitioner's Exhibit 1, Court Reporter's Transcript pages 90-92) and moved the trial court for a judgment of acquittal based on the certificate of analysis not conforming with the controlling statute. (See Petitioner's Exhibit 2, Court Reporter's Transcript pages 108-109). He has timely appealed his case and exhausted every remedy available to him in the courts of the Great State of Alabama. Now this Petitioner seeks as his final resort the assistance of this Honorable Court. To allow his conviction to stand where no evidence was presented to the fact finding body that the alleged controlled substance was in fact a controlled substance is an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. To allow this conviction to stand in the face of insufficient evidence will result in a manifest injustice and create an eroding effect on a Defendant's right to have a fair trial and be convicted only upon the prosecution meeting the burden of proof on all requisite elements of the crime charged beyond a reasonable doubt. A victory for the State of Alabama on this matter is a defeat of the rights of each and every citizen of this great nation.

**RESPECTFULLY SUBMITTED**, this the 20th day of June 2008.

Robert Troy Teague (TEA012)
Attorney for Petitioner

**Robert Troy Teague**
906 South Perry Street, Ste. 201
Montgomery, AL 36104
PH (334) 834-5553
E-mail: teague345@hotmail.com

## EXHIBITS

Exhibit 1:    Pages 90-92 of the Court Reporter's Transcripts. ***State of Alabama vs. Carlos Williams***, CC-06-141.

Exhibit 2:    Pages 108-109 of the Court Reporters Transcripts. ***State of Alabama vs. Carlos Williams***, CC-06-141.

Exhibit 3:    Pages 1-146 of the Court Reporters Transcripts. ***State of Alabama vs. Carlos Williams***, CC-06-141.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of June 2008, I have filed a copy of the foregoing Response to the Respondent's Answer of May 23, 2008 with the Clerk of the Court and I hereby certify that I have mailed by the United States Postal Service the document to the following: Alabama Office of Attorney General, Ms. Madeline Hinson Lewis, Criminal Appeals Division, 11 South Union Street, Montgomery, AL 36130-0152 and Ms. Constance C. Walker, c/o Haskell, Slaughter, Young & Gallion, LLC, PO Box 4660, Montgomery, AL 36103-4660.

Robert Troy Teague (TEA012)
Attorney for Petitioner

Address of counsel:

**Robert Troy Teague**
906 South Perry Street, Ste. 201
Montgomery, AL  36104
PH (334) 834-5553
E-mail: teague345@hotmail.com

```
 1   evidence that was turned over to me that day.

 2   Q.   How do you know it's the same envelope?

 3   A.   Because it's sealed, and got my initials on it.

 4   Q.   All right.  Is there anything in the envelope?

 5   A.   Yes, there's crack cocaine in the envelope.

 6   Q.   It may already be opened.  Can you --

 7        MR. BLEVINS:  Judge, I'm going to object.

 8        Unless the witness is a qualified forensic

 9        scientist, move to strike his answer.

10        THE COURT:  Overruled.

11   Q.   And do you recognize what you just pulled out of

12   the envelope?

13   A.   Yes, I do.

14   Q.   And what is that?

15   A.   It's the drug evidence I submitted to the

16   Department of Forensic Sciences.

17   Q.   Now, do you have a Forensic Sciences number on any

18   of that that corresponds to the documents they have?

19   A.   I do.

20   Q.   And what's the number on the package?

21   A.   05MG02463.

22        MR. DAVIDSON:  Judge, we would move to admit

23        Exhibit Number 1 into evidence.

24        MR. BLEVINS:  Objection; lack of proper

25        predicate.
```



91

1          THE COURT:  Admitted.  Overruled; admitted.

2                  (State's Exhibit Number 1 was admitted

3                  into evidence.)

4     Q.   Let me show you what's been marked as State's

5     Exhibit 2 for identification purposes, and ask if

6     you -- if you recognize this?

7     A.   I do.

8     Q.   And what is that?

9     A.   This is the receipt we get back from DFS.  It

10    gives us the results of the evidence that we

11    submitted.

12    Q.   Now, is there a number on that form?

13    A.   There is.

14    Q.   And what's that number?

15    A.   05MG02463.

16    Q.   The same number that was on the drugs you

17    submitted?

18    A.   Correct.

19         MR. DAVIDSON:  Judge, we would move to offer

20         Exhibit 2 into evidence.

21         MR. BLEVINS:  Objection; lack of proper

22         predicate and conformity with statutory

23         requirements.

24         THE COURT:  Overruled.  Admitted.

25                  (State's Exhibit Number 2 was admitted

```
 1              into evidence.)
 2    Q.  Did that document evidence a result of testing on
 3    those drugs you submitted?
 4    A.  It does.
 5    Q.  And what was the result?
 6          MR. BLEVINS:  Judge, if I could have a
 7       continuing objection on all the testimony based
 8       upon this document.
 9          THE COURT:  You have a continuing objection.
10       Overruled.
11    A.  The Results of Analysis reads, "Laboratory
12    analysis of the solid material revealed the presence
13    of cocaine base, a controlled substance.  One --
14    Weight in grams, 1.12 grams.
15          MR. DAVIDSON:  No further questions, Your
16       Honor.
17          THE COURT:  All right.  Cross-examination.
18                    CROSS-EXAMINATION
19    BY MR. BLEVINS:
20    Q.  Detective Bartlett, is there a distinction of
21    being called a case agent?  Is there a difference in
22    just an ordinary officer involved in the case?
23    A.  More stress.
24    Q.  Okay.  Are you, like, the case agent, the officer
25    who has primary responsibility for the case itself?
```

108

```
 1    cases, and I disagree with the analysis of the

 2    facts in this case and what those two cases stand

 3    for.  So the motion to dismiss is hereby denied.

 4        What says the State?  Any jury charges?  Any

 5    jury charges other than the standard charges?

 6        MR. BLEVINS:  Judge, can I also -- I made an

 7    objection earlier.  I also move for a judgment of

 8    acquittal on the basis that the forensic analysis

 9    document -- let me refer to it by exhibit

10    number -- one or the other one says the State must

11    prove that the substance is a controlled

12    substance.

13        State's Exhibit 2 is devoid of the

14    notarization or signature required on this

15    document to authenticate the substance.

16        THE COURT:  Okay.  Motion denied.

17        Any charge of constructive possession?  Any

18    charges?

19        MR. FOREMAN:  Probably -- Just give us the

20    standard one.

21        THE COURT:  All right.  15 minutes a side.

22    That's enough time.

23        Y'all ready?  Do you have any witnesses?

24        MR. BLEVINS:  No, sir.  Defense would rest.

25    If I could renew my motion for judgment of
```



109

```
 1        acquittal --
 2              THE COURT:  Motion denied.
 3              MR. BLEVINS:  -- on the same grounds
 4        previously argued.
 5              THE COURT:  Motion denied.
 6              All right.  Turner, what are we doing?
 7                    (There was a brief interruption of the
 8                     proceedings while the Court discussed
 9                     another case.)
10              All right.  You've got 15 minutes a side,
11        then I'll charge the jury.
12                    (The jury was placed in the box, after
13                     which the following proceedings were held
14                     in their presence:)
15              THE COURT:  All right.  Is the state ready?
16              MR. DAVIDSON:  Yes, Your Honor.
17              THE COURT:  It's time for closing argument.
18        You have you 15 minutes a side.  The State goes
19        first.
20              MR. DAVIDSON:  Thank you.
21                         CLOSING ARGUMENT
22        BY MR. DAVIDSON:
23              Ladies and gentlemen, I just want to spend a
24        few minutes focusing on some of the law that I
25        want you to focus on in this case.  Judge Price
```

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR MONTGOMERY COUNTY
MONTGOMERY, ALABAMA


STATE OF ALABAMA        )
                       )
vs.                  )     CC-2006-141-PR
                       )
CARLOS WILLIAMS,       )
                       )
       Defendant.    )



TRANSCRIPT OF JURY TRIAL
TUESDAY, MAY 2, 2006

TRANSCRIPT OF SENTENCING HEARING
FRIDAY, MAY 19, 2006
COURTROOM 4-C
BEFORE THE HONORABLE CHARLES PRICE
PRESIDING CIRCUIT COURT JUDGE


APPEARANCES:

For the State:         RICHARD FOREMAN
                     KEVIN DAVIDSON
                     Deputy District Attorneys
                     Fifteenth Judicial Circuit
                     Montgomery, Alabama


For the Defendant:    JERRY BLEVINS
                     Attorney at Law
                     Montgomery, Alabama


Denise L. Gordon
Official Court Reporter
(334) 832-1330



2

INDEX OF PROCEEDINGS

May 2, 2006 Trial.....................................3
May 19, 2006 Sentencing Hearing....................141

Jury Voir Dire.......................................3
Opening Statements by Mr. Davidson..................24
Opening Statements by Mr. Blevins...................26
The State Rests....................................105
The Defendant Rests................................108
Closing Argument by Mr. Davidson...................109
Closing Argument by Mr. Blevins....................114
Rebuttal Closing by Mr. Foreman....................120
The Court's Charge to the Jury.....................124
Verdict............................................138
Polling of the Jury................................138
The Reporter's Certificate.........................146

EXAMINATION

MICHAEL DRUMMOND
     Direct by Mr. Foreman..........................35
     Cross by Mr. Blevins...........................42
     Redirect by Mr. Foreman........................53
     Recross by Mr. Blevins.........................55

THOMAS NEIL THOMPSON
     Direct by Mr. Foreman..........................60
     Cross by Mr. Blevins...........................68
     Redirect by Mr. Foreman........................80
     Recross by Mr. Blevins.........................81

BRAD BARTLETT
     Direct by Mr. Davidson.........................86
     Cross by Mr. Blevins...........................92
     Redirect by Mr. Davidson......................102
     Recross by Mr. Blevins........................103

EXHIBITS ADMITTED INTO EVIDENCE

State's 1        Cocaine                        91
State's 2        Certificate of Analysis        91

Denise L. Gordon
Official Court Reporter
(334) 832-1330

```
 1                     (The following proceedings occurred

 2                     before the Honorable Charles Price,

 3                     Presiding Circuit Court Judge, in regard

 4                     to the above-styled cause, commencing on

 5                     Tuesday, May 2, 2006:)

 6           THE COURT:  Is the State ready?

 7           MR. DAVIDSON:  Yes, Your Honor.

 8           THE COURT:  Defense?

 9           MR. BLEVINS:  Defense is ready, Your Honor.

10           THE COURT:  All right.  Ladies and gentlemen,

11      raise your right hand.

12                     (The venire was duly sworn by the Court.)

13           THE COURT:  You went through orientation

14      Monday morning.  Some of the questions I'll ask

15      you now were asked of you during the Monday

16      morning session, orientation.

17           Is there any member of the venire who is

18      not -- who is less than 19 years of age?

19                     (No response.)

20           THE COURT:  Any member of the venire who has

21      not lived in Montgomery County for at least one

22      year prior to receiving your summons to come to

23      jury duty?

24                     (No response.)

25           THE COURT:  Is there any member of the venire
```

4

```
 1      who does the live in Montgomery County at this
 2      time?
 3                 (No response.)
 4           THE COURT:   Any member of the venire who has
 5      ever been convicted of a crime other than a
 6      traffic offense and have not are had your civil
 7      rights restored?
 8                 (No response.)
 9           THE COURT:   Anyone under indictment at this
10      time?
11                 (No response.)
12           THE COURT:   Anyone in the venire who does not
13      speak or understand the English language?
14                 (No response.)
15           THE COURT:   Anyone who has any physical or
16      mental condition that in your opinion would impede
17      you carrying out your -- performing your duties as
18      a juror if you are selected to serve on this petit
19      jury?
20                 (No response.)
21           THE COURT:   Representing the State of Alabama
22      in this case is Mr. Foreman and .
23           Who is your assistant?  What's your name?
24           MR. DAVIDSON:   Kevin Davidson.
25           THE COURT:   Mr. Kerin -- Kevin Davidson.
```

```
 1        They're deputy district attorneys from Montgomery
 2        County.  They'll be presenting the evidence on
 3        behalf of the State of Alabama.  The district
 4        attorney from Montgomery County is Ms. Ellen
 5        Brooks.
 6            Has anyone on the venire ever been
 7        represented in any legal matter by Mr. Foreman or
 8        Mr. Davidson?
 9                (No response.)
10            THE COURT:  Anyone know either one of them?
11                (No response.)
12            THE COURT:  As I stated, Ms. Brooks is the
13        district attorney.  On her staff she has in
14        addition to the two deputy district attorneys,
15        here, she has other lawyers on her staff,
16        secretaries and other support personnel.
17            Anyone consider yourself well-acquainted with
18        or a friend of anyone who works for the district
19        attorney's office?  Please stand.
20                (A venireman stood.)
21            THE COURT:  State your name, please.
22            THE VENIREMAN:  Evaughn Balkcom.  My
23        son-in-law is in the district attorney's office.
24            THE COURT:  And what is his name?
25            THE VENIREMAN:  Larry Lynn.
```

6

```
 1              THE COURT:  Okay.  Mr. Lynn.
 2         Ms. Balkcom, if you are selected to serve on
 3    this jury, and your son-in-law works for the
 4    district attorney's office, would that put you in
 5    a position where you would lean toward the side
 6    that the district attorney represents, and
 7    consequently you could not go into the jury room
 8    with the rest of the jurors and render a fair and
 9    impartial verdict based on the law and the
10    evidence in this case because you would already
11    have decided to lean toward the side of the
12    district attorney's office because you your son
13    works in the district attorney's office?
14              THE VENIREMAN:  No, sir.
15         THE COURT:  Okay.  Anyone else
16    well-acquainted with or friends with anyone with
17    anyone who works for the district attorney's
18    office?
19              (No response.)
20         THE COURT:  Representing the defendant in
21    this case, of course, is Mr. Blevins.  He
22    practices law in the city of Montgomery.  Anyone
23    ever been represented by Mr. Blevins or know Mr.
24    Blevins?
25              (No response.)
```

7

```
 1          THE COURT:  Think you know him?
 2              (No response.)
 3          THE COURT:  Okay.  The defendant in this
 4     case, Mr. Carlos William Raymond Williams.
 5          Anyone know Mr. Williams?  Allegedly lives at
 6     57 Thelma Lane, Hope Hull, Alabama.  Anyone know
 7     Mr. Williams or think know Mr. Williams?
 8              (No response.)
 9          THE COURT:  I'm going to call off some
10     additional names.  Mr. Williams, of course, is
11     charged with the criminal offense of --
12          MR. FOREMAN:  Judge, may I approach?
13          THE COURT:  Yes.
14              (There was a sidebar conference; not
15              reported.)
16          THE COURT:  Ms. Baldwin -- What's your name?
17          THE VENIREMAN:  Balkcom.
18          THE COURT:  Ms. Balkcom.
19          THE VENIREMAN:  Yes, sir.
20          THE COURT:  What kind of work does your son
21     do for the district attorney's office?
22          THE VENIREMAN:  Right now he is in the
23     juvenile area.
24          THE COURT:  Okay.  Is he a lawyer?
25          THE VENIREMAN:  Yes, sir.
```

8

```
 1              THE COURT:  Okay.  Thank you.

 2         Mr. Williams is charged with the criminal

 3    offense of possession of a controlled substance.

 4    Possession of controlled a substance.

 5         Now, I'm going to call off some potential

 6    witnesses, and if these witnesses are here, of

 7    course, they will come to the front of the

 8    courtroom and -- so the jurors can see them.

 9         Detective B.W. Bartlett.

10         Where is he?

11         MR. FOREMAN:  Judge, I believe he's on his

12    way up right here now.

13         THE COURT:  All right.  Detective S.T.

14    Wright.

15         MR. FOREMAN:  Same thing.

16         THE COURT:  Detective M.N. Drummond.  And

17    Special Agent Neil Thompson.

18         Well, I cannot strike this jury until these

19    witnesses get here because I need the jury to see

20    whether these witnesses are here.

21         MR. FOREMAN:  Yes, sir.

22         Judge Detective Bartlett and Sergeant

23    Drummond are here.

24         THE COURT:  Detective Bartlett.  Step over so

25    the jury can see you.  Turn around so they can see
```

9

1 you.

2    (The officers comply.)

3   THE COURT:  Wait a  minute; just one at a

4 time so they'll know which one is Bartlett.

5   Raise your hand, Bartlett.

6    (Detective Bartlett complies.)

7   THE COURT:  Anyone know Detective B.W.

8 Bartlett?

9    (A hand was raised.)

10   THE COURT:  Okay.  Please stand.  State your

11 name.

12   THE VENIREMAN:  Mark Azar.

13   THE COURT:  Mr. Azar, how do you know Mr.

14 Bartlett?

15   THE VENIREMAN:  I sell the police department

16 their uniforms.

17   THE COURT:  Okay.  And through selling the

18 police department their uniforms, did you come in

19 contact with Mr. Bartlett?

20   THE VENIREMAN:  I have.

21   THE COURT:  Okay.  If you are selected to

22 serve on this jury, and the fact you sell the

23 police department uniforms, and you have that

24 contact with Mr. Bartlett, would you lean toward

25 the side he testifies, and therefore, it would

10

1     compromise your conscience, which means, then, you

2     could not go into the jury room with the rest of

3     the jurors and render a fair and impartial verdict

4     based on the evidence and the law because you will

5     be leaning toward the side Mr. Bartlett testifies

6     for?

7          THE VENIREMAN:  No.

8          THE COURT:  Okay.

9          Sergeant M.N. Drummond.  Raise your hand.

10              (Sergeant Drummond complied.)

11          THE COURT:  Anyone know Sergeant Drummond?

12              (A hand was raised.)

13          THE COURT:  Please stand.  State your name.

14          THE VENIREMAN:  Mark Azar.

15          THE COURT:  Mr. Azar, I asked you the same

16     question about Mr. Drummond.  Since you come in

17     contact with Mr. Drummond, you sell legal to the

18     police department, if you are selected to serve as

19     a juror in this case, would that cause you to lean

20     toward the side that Mr. Drummond testifies for,

21     and consequently then, you could not go in the

22     jury room with the rest of the jurors at the end

23     of this trial and render a fair and impartial

24     verdict based on the evidence and the law because

25     you will be leaning toward the side that Mr.

11

```
 1       Drummond testifies for?
 2            THE VENIREMAN:  No.
 3            THE COURT:  Okay.  It would not affect you.
 4       Thank you.
 5            You may return to the jury room -- witness
 6       room.
 7            There are a few more questions I'll ask you.
 8       Anyone by blood or marriage work for law
 9       enforcement, either you or anyone in your family
10       by blood or marriage work for law enforcement?  If
11       so, please stand.  Please stand.
12                (A venireman stood.)
13            THE COURT:  State your name.
14            THE VENIREMAN:  Laura Wilson-Leonard.
15            THE COURT:  Laura what?
16            THE VENIREMAN:  Wilson-Leanard.
17            THE COURT:  Okay.  And who in your family
18       works for law enforcement?
19            THE VENIREMAN:  My sister is a city cop.
20            THE COURT:  For Montgomery, the City of
21       Montgomery?
22            THE VENIREMAN:  Uh-uh.
23            THE COURT:  Where?
24            THE VENIREMAN:  Actually, Clayton County,
25       Georgia.
```

```
 1              THE COURT:  Clayton County, Georgia?
 2         THE VENIREMAN:  Yes.
 3         THE COURT:  Thank you.
 4         Yes.
 5         A VENIREMAN:  My name is Callie Bell, and my
 6    niece is a state trooper.
 7         THE COURT:  All right.  What state?
 8         THE VENIREMAN:  Montgomery County.
 9         THE COURT:  The State of Alabama?
10         THE VENIREMAN:  Yes.
11         THE COURT:  Thank you, ma'am.
12         Anyone else?  Either you or anyone in your
13    immediate family by blood or marriage work for law
14    enforcement?
15              (No response.)
16         THE COURT:  Is there anyone -- in America,
17    the principal law is that one is charged with an
18    offense is presumed to innocent, and that
19    presumption attends and stays with that person as
20    a piece of evidence in his favor until the
21    State -- the government meets the burden of
22    proving the person guilty beyond a reasonable
23    doubt.  Anyone disagrees with that principle of
24    law?
25              (No response.)
```

13

```
 1              THE COURT:  Okay.  There are organizations in
 2      America, and perhaps some in the State of Alabama,
 3      may be some in Montgomery that -- what are call
 4      advocacy groups.  They advocate on behalf of
 5      something or against something.  And some of those
 6      basically deal with, perhaps, drugs.
 7              Is there anyone a member of any advocacy
 8      group or do you believe -- that advocate that the
 9      laws are too lax or too strenuous or too harsh,
10      either side?  Anyone a member of any group that
11      takes the public position -- not so much you
12      individually, now, but takes a public view on the
13      laws dealing with drugs one way or the other?
14                     (No response.)
15              THE COURT:  Anyone know of any reason why you
16      should not be selected to serve on this jury, it
17      just wasn't be fair for you to serve on this jury?
18                     (No response.)
19              THE COURT:  What says the State?  Is the
20      State satisfied?
21              MR. FOREMAN:  Yes, sir, the State is
22      satisfied.
23              THE COURT:  Is defense satisfied?
24              MR. BLEVINS:  Your Honor, may I approach?
25              THE COURT:  Yes.
```

14

```
 1              (There was a sidebar conference; not
 2          reported.)
 3          THE COURT:  All right.  Ladies and gentlemen,
 4      I'll ask that question again so you won't
 5      distracted.  Does anyone know of any reason why
 6      you should not be selected to serve on this jury?
 7              (No response.)
 8          THE COURT:  Hearing none, the clerk now will
 9      call the roll.  When the clerk calls the roll,
10      please stand and state your name.  If you are
11      employed, where you work.  If you are retired,
12      which job you retired from.  If you are married
13      and your spouse work, state where he or she works.
14      If he or she is retired, which job he or retired
15      from.
16          I do not want you, nor do I expect you to
17      state your address.  When she completes the list,
18      I'll return to the courtroom, and we'll striking
19      the jury.  Okay?
20          You may start.
21              (The above-referenced roll call was
22          conducted; not reported.)
23          THE COURT:  All right.  Ladies and gentlemen,
24      to keep you from going up an down the stairs and
25      getting all the exercise that you're accustomed to
```

15

```
 1          getting since you've been here this week, I'm
 2          going to take the lawyers in the back, and we'll
 3          strike the jury before I dismiss you to go back
 4          downstairs.
 5               If we can have the lawyers in the back and
 6          the court reporter, we'll strike the jury.
 7                    (The following proceedings were held in
 8                     camera, outside the presence of the
 9                     venire:)
10               THE COURT:  You've got eight strikes each.
11          The State goes first.
12               The Court sees no reason why we should have a
13          Batson or file a motion.
14                    (The attorneys conducted the striking of
15                     the jury; not reported.)
16               THE COURT:  All right.  Y'all ready?
17               MR. BLEVINS:  Yes, sir.
18               Judge, we do have a pending motion in limine.
19               THE COURT:  Okay.  What's your motion?
20               MR. BLEVINS:  I need to grab my file.
21               THE COURT:  Is it a Batson or --
22               MR. BLEVINS:  No, sir.  It's just a motion in
23          limine.
24               THE COURT:  Well, what is it?  What is it
25          about?
```

16

```
 1          MR. BLEVINS:  I believe you already ruled on

 2     the same one on the codefendant's case.

 3          THE COURT:  Well, go ahead.

 4          MR. BLEVINS:  I need to make my record,

 5     Judge.

 6          THE COURT:  Let's go.

 7          MR. BLEVINS:  Judge, with respect to our

 8     motion in limine filed March 27, '06, we've

 9     attached to that motion, Exhibit A, which is a

10     summary of the charge in this case.  We expect at

11     trial, the State's going to attempt to elicit

12     evidence concerning this alleged reverse drug deal

13     referenced in Exhibit A.  We're asking for an in

14     limine ruling excluding all evidence pertaining to

15     that reverse drug transaction in that it is

16     irrelevant to the charge here today.

17          The State can show no connection between this

18     alleged reverse drug deal --

19          THE COURT:  What is the alleged reverse drug

20     deal?

21          MR. BLEVINS:  In a nutshell, an undercover

22     agent tries to buy -- or tries to sell some

23     cocaine to a person identified as Cleveland

24     Jointer.

25          THE COURT:  Yeah, yeah.  Go ahead and put it
```

17

1    all in the record.

2        MR. BLEVINS:  The summary indicates that

3    the -- Cleveland Jointer said, "I've got the money

4    in some other vehicle;" left the location of the

5    drug deal; came back a short while later; was

6    followed by an automobile in which my client was

7    the driver; was occupied by a second individual,

8    Xavier Jointer.

9        The police then surrounded the vehicle that

10    was my client was in, and subsequently arrested

11    him for possession of cocaine.  Now, the return

12    trip by Cleveland Jointer was supposedly for the

13    purpose of bringing additional money back to make

14    the drug buy.  There was no money found in my

15    client's car.  There is no evidence showing that

16    my client's car coming into that location was in

17    any way related or connected to the first drug

18    deal.

19        THE COURT:  What says the State?

20        MR. FOREMAN:  Well, Judge, I think if you

21    will remember the suppression hearings we've had

22    in this matter is that the testimony is that --

23    from the officers, and what I expect to be still

24    today, is that they had observed the defendants

25    together.  They did surveillance.  The observed

18

```
 1          the cars together; they come in together, and at

 2          that point, it also happens to be Cleveland

 3          Jointer, Xavier Jointer's brother was in the car,

 4          and two cars.

 5              The evidence shows, I think, that these two

 6          were a part of that whole transaction.

 7              THE COURT:  The motion is denied, except the

 8          Court will instruct the State that the evidence as

 9          it relates to Cleveland Jointer saying that the

10          money is in another car, just after a conversation

11          overheard that they followed Cleveland Jointer up

12          to the service station, wherever they went.

13              So the motion is denied except for that.

14          Okay?

15              MR. BLEVINS:  And If I could just object.  If

16          it's relevant, its probative value is outweighed

17          by its prejudicial effect.

18              THE COURT:  Okay.

19              MR. BLEVINS:  And just so Your Honor knows, I

20          believe there was a misunderstanding of the

21          evidence at Xavier Jointer's hearing.  The

22          evidence was that law enforcement followed

23          Cleveland Jointer when he went to go get the

24          money, and saw my client with Cleveland Jointer.

25          The only testimony at that hearing was the officer
```

19

1    saw Cleveland Jointer with -- around the vehicle

2    my client was apprehended in before the drug

3    transaction occurred.

4         THE COURT:  All right.  Sure.  I mean, I

5    understand it.

6         You understand it?

7         MR. FOREMAN:  Yeah.  Judge, just for my own

8    sake, can you clarify as to what --

9         THE COURT:  Well, what Mr. Blanchard (sic)

10   said was that the -- there was a conversation and

11   the officer overheard Jointer say the money -- The

12   CI, the money is in another car, another place, I

13   have to go get it."

14        I say, I'll grant that motion because that's

15   hearsay if Mr. Jointer is not going to testify.

16   After a conversation they overheard, then they can

17   testify to what happened.  Okay?

18        All right.  Thank you.

19             (The in camera proceedings were

20             concluded, and the following proceedings

21             were held in open court in the presence

22             of the venire:)

23        THE COURT:  Put them in the box and swear

24   them in.

25             (The jury was placed in the box, and duly

```
 1                    sworn in by the clerk of the court.)
 2          THE COURT:  Is the State ready?
 3          MR. FOREMAN:  Yes, sir.
 4          THE COURT:  Defense ready?
 5          MR. BLEVINS:  Yes, sir.
 6          THE COURT:  Ladies and gentlemen, let me see
 7     the hands of those who have served on jury duty
 8     before, petit jury, where you are now?
 9                    (There was a show of hands.)
10          THE COURT:  Practically eight out of four --
11     Nine -- let me state to you the procedure under
12     which the case will be tried so you'll know the
13     proper procedure.  For those who have served on a
14     jury before, this will just re-acquaint you with
15     the procedure of the Court.
16          First of all, you came here this morning with
17     a -- part of the venire.
18          Those who were not selected to serve on this
19     jury, please return to the jury assembly room.
20     Mr. Merrill will let you know what to do.
21                    (The remaining members of the venire
22                    exited the courtroom.)
23          THE COURT:  As I was introducing the
24     witnesses this morning -- This is Special Agent
25     Neil Thompson.  I called his name.  No one in the
```

21

1    venire recognized his name.

2        I'll ask the jury, anyone on the jury now, do

3    you recognize or know Special Agent Neil Thompson

4    from DEA?

5            (No response.)

6        THE COURT:  All right.  Thank you.

7        MR. BLEVINS:  Your Honor, may we approach?

8        THE COURT:  Yes.

9            (There was the following sidebar

10           discussion:)

11       MR. BLEVINS:  Judge, my understanding

12   earlier, they brought in their witnesses for the

13   venire to see.

14       THE COURT:  Sure.

15       MR. BLEVINS:  Now, if -- I thought they

16   brought in all of them.

17       THE COURT:  No, they didn't.  They only

18   brought in two; Drummond and Bartlett.

19       MR. BLEVINS:  I mean, if this witness had

20   been brought in, other members of the venire may

21   have said they knew him, and it affect -- it could

22   affect their ability to be impartial.

23       THE COURT:  They're not on the jury anyway.

24       MR. BLEVINS:  Which may have allowed me to

25   excuse them for cause or get in some grounds to

1    strike them.

2        THE COURT:   The Court has done the same thing

3    I've done in other cases; it's the proper way to

4    do it.  Okay?  So have a seat.

5        Let me tell y'all, I'm not going to be

6    putting up with approaching the bench every five

7    minutes.  And that's for both sides.

8        All right.  Have a seat.

9            (The sidebar conference was concluded.)

10       THE COURT:   The procedure under which this

11   case will be tried, we brought a venire here, of

12   course, and I asked certain questions to make sure

13   you all were qualified.  Then I asked questions

14   whether or not anyone knew any of the parties, and

15   for that reason you should not be selected to

16   serve on this jury.

17       Hearing nothing then, of course, from that

18   venire, you 12 individuals were selected to try

19   the case and render a verdict in this case.

20       Now, we'll start the trial by the lawyers

21   presenting their opening argument.  Opening

22   argument is not evidence in the case.  The opening

23   argument is the time for the lawyers, both sides,

24   to tell you what evidence -- they expect the

25   evidence to show.  The State will go first because

23

```
 1          the State has the burden of proof to prove the
 2          defendant guilty beyond a reasonable doubt.
 3               The defendant has a piece of evidence that
 4          attaches to him at the time of arrest, and is
 5          still with him and travels with him and stays with
 6          him up until the State proves his guilt beyond a
 7          reasonable doubt, and that's the presumption of
 8          innocence.
 9               Now, the State goes first.  Defense will go,
10          give the opening statement.  If the defense wants
11          to rebut -- if the State wants to rebut what the
12          defense says, the State has that opportunity.
13          Call witnesses; examine witnesses; cross-examine
14          witnesses; both sides close the case; both sides
15          rest the case.
16               Then the lawyers present their closing
17          argument.  Closing argument is the counterpart to
18          the opening statement.  In opening statements, the
19          lawyers tell you what they expect the evidence to
20          show.  In closing arguments the lawyers get a
21          chance to argue to you and try to persuade you
22          which side should prevail.
23               Opening statements is not evidence in the
24          case.  Questions by the lawyers is not evidence in
25          the case.  Closing argument is not evidence in the
```

24

1    case.

2        I'll tell you more about that at the end of

3    this trial.  So if I tell you what is not evidence

4    in the case, and you have not served on jury

5    before.  If you have and still want to know, your

6    question should be, Well, then, what is evidence

7    in the case?

8        Well, I can't tell you what is evidence;

9    that's what you 12 folks will tell the Court and

10   tell these parties.  I can tell you where the

11   evidence will come from.  The evidence will come

12   from this witness stand; that is, what the

13   witnesses say, and any tangible evidence I admit

14   into this trial.  It will be up to you to decide

15   the credibility of the witnesses, and who you

16   believe and who you do not believe.

17       And at the end of this trial, I'll charge you

18   on the law and the rules that govern your jury

19   duty as you retire to the jury room to begin your

20   deliberations.

21       All right.  Opening statements.

22                   OPENING STATEMENTS

23   BY MR. DAVIDSON:

24       Good morning, ladies and gentlemen.

25       I'm going to be real brief in my statements

25

1    because I expect the evidence to be very clear

2    today, that in a few minutes you'll be able to

3    hear testimony for yourself.

4         I expect the evidence to be July 20th of

5    2005, here in Montgomery County, near the

6    Residence Inn on Hilmar Court, there was a vehicle

7    that had been driven by the defendant with a

8    passenger, an Xavier Jointer sitting in the

9    passenger seat of that vehicle.

10        Officers saw the vehicle; were approaching

11   the vehicle; observed Mr. Jointer, the passenger,

12   making some movements with his body.  They thought

13   possibly he was hiding something; possibly doing

14   something; they weren't sure, so they

15   investigated.

16        For their own safety, they asked both

17   occupants out of the vehicle.  For their own

18   safety, they just looked in that area where the

19   passenger had been reaching around to see, perhaps

20   it was a weapon or something else; see what it was

21   he had been doing.

22        In plain view, right there in the center

23   console area, they saw cocaine.  They retrieved

24   it; sent it to Forensic Sciences for testing.  I

25   expect you'll hear testimony and have evidence

```
 1        that it came back as cocaine.
 2              The testimony will be it was in plain sight,
 3        right there within arm's reach of the defendant
 4        who was driving the vehicle.  He would have known
 5        it was there.
 6              I expect at the end of the case, you'll hear
 7        the judge give the law on this case.  He's charged
 8        with possession of a controlled substance.  I
 9        expect that based on that law, and based on what
10        you hear, the evidence presented to you today,
11        you'll find the defendant guilty of possessing
12        that cocaine.
13              Thank you.
14              THE COURT:  All right.
15              MR. BLEVINS:  May it please the Court.  Your
16        Honor, may I roll the podium up there?
17              THE COURT:  You may.
18              Thank goodness it rolls so I don't have to
19        pick it up.
20                        OPENING STATEMENTS
21   BY MR. BLEVINS:
22              Good morning, ladies and gentlemen.
23              I, too, expect I'm going to be somewhat
24        brief.  And unlike a lot of trials, it sounds like
25        we agree on much of what the evidence is.  In
```

1    fact, you're going to find when the evidence is

2    presented in this case, that most of the so-called

3    facts are not in dispute. We're going to

4    acknowledge certain facts that the State has said

5    are facts.

6         The problem is, in the end, you're going to

7    find that Carlos Williams didn't possess any

8    drugs. The drugs were not his.

9         Let me just run over with you and sort of

10   tell you what I expect the evidence to show and

11   what I expect the evidence not to show during this

12   trial so you can be focused and paying attention,

13   and look for these things as the witnesses

14   testify.

15        First thing, the Court's told you there's a

16   charge of possession of cocaine; possession of a

17   controlled substance. You have can two types of

18   possession; actual or constructive. Actual

19   meaning, you have it in your pocket. You have it

20   on you. Constructive meaning it's laying over

21   there, but it's yours. All right?

22        You're going to find from the evidence that

23   this is what's called a constructive possession

24   case. Nobody had it in their pocket; in their

25   hand; in their jacket. It was laying over there

28

1    in an automobile.

2        The evidence is going to show that the

3    vehicle that the cocaine was recovered in is not

4    registered to Carlos Williams.  That's not his

5    vehicle.  That's going to be undisputed.

6        The undisputed evidence is further going to

7    show that Carlos Williams was not found with any

8    drugs on him; in his pocket; in his shoe; in his

9    hat; in his mouth, anywhere.  Not one drug was

10   found on him.  The evidence will without question

11   show that he was found not in possession of

12   cocaine, which is the charge in this case.

13       The officer is going to take the stand, and

14   he's going to tell you just what the DA told you.

15   They approached the car.  Xavier Jointer, who was

16   the passenger in Mr. Williams' car, started acting

17   fidgety.  The officer gave some commands.  Xavier

18   Jointer disobeyed their commands, and was

19   fidgeting around in the car.  That's true.

20       And what Xavier Jointer did was, he was

21   trying to hide cocaine that he had when the police

22   approached.  And in the midst of officers pointing

23   their guns at him in the car, and him fidgeting,

24   he dropped the cocaine on the console.  So when

25   the police came into the car, they found the

29

```
 1      cocaine that Xavier Jointer had in his possession
 2      and had dropped it in the console trying to hide
 3      it.
 4          Now, the evidence is going to be undisputed
 5      the police after they found the cocaine, arrested
 6      Carlos Williams and Xavier Jointer; arrested both
 7      of them.  And charged both of them with possessing
 8      this one little piece of cocaine you're going to
 9      see.  And the most important thing during this
10      trial is going to be the officer is going to sit
11      on that stand and tell you, he doesn't know who
12      the drugs belonged to.  The officer is going to
13      tell you he can't tell you the drugs belonged to
14      Carlos Williams.
15          But yet at the conclusion of this case, the
16      DA's office here is going to ask you to take a
17      guess with lack of evidence that the drugs were
18      Carlos Williams'.  We expect the evidence to be
19      very clear that Xavier Jointer possessed those
20      drugs; Xavier Jointer put those drugs in that
21      console; he was fidgeting.
22          Carlos Williams didn't fidget.  He obeyed the
23      law enforcement's commands when they were pointing
24      the gun at him.  He didn't drop anything.  He
25      didn't try to hide anything.  He obeyed them.  He
```

30

1    got out of the car, he did nothing.  He didn't try

2    to run.  He didn't say anything about the drugs

3    were his.  He did nothing.  He was simply in the

4    car.

5         At the conclusion of this case, I think it's

6    going to be without question, based on the -- the

7    entire evidence; based upon the undisputed facts

8    that comes from this stand, you're going to come

9    back in here and find Carlos Williams not guilty.

10            Thank you.

11        THE COURT:  All right.

12        Call your first witness.

13        MR. FOREMAN:  Judge, I need to approach,

14    please.

15            (There was a sidebar conference; not

16            reported.)

17        THE COURT:  Let me see the lawyers in the

18    back.  Let me see the court reporter.

19            (The following proceedings were held in

20            camera, outside the presence of the

21            jury:)

22        THE COURT:  Now, let the record show we're

23    outside the jury's presence.

24        It's always been my concern, Mr. Blevins, how

25    in the world you're going to represent both of

1    these defendants.  But that's a decision you have

2    to make.

3         Now, you're saying that it's Jointer's drugs.

4    You represent Jointer.  What is going to be the

5    position on Jointer, that it's Williams' drugs?  I

6    don't know.  But it is some concern of mine.  I

7    mean, but I don't get into -- If you feel you can

8    do it, it's fine with me.  But I do have some --

9    that's always been a question in my mind.  And

10   that's one reason I held off on consolidating

11   these cases, which should have been done, perhaps.

12   Because I didn't know how you were going to split

13   the representation.

14        Now, what is your position?  I can't tell

15   Blevins what to do.

16        MR. FOREMAN:  Judge, I would ask that he

17   recuse himself from one of these cases.  It's

18   clearly an ethical violation to represent two

19   codefendants when you're going to, first of all,

20   representing Mr. Williams say, Hey, the drugs

21   belong to Xavier Jointer.

22        THE COURT:  Not so loud.  Not so loud.

23        MR. FOREMAN:  -- saying the drugs belong to

24   Xavier Jointer, if he then turns around and -- I

25   mean he can come before the Court at that point an

32

```
1    honestly represent Xavier Jointer saying it's not

2    his drugs if that's what he's representing to this

3    Court.

4         THE COURT:  Well, I'll just have to wait --

5         MR. FOREMAN:  And that is clearly an ethical

6    violation.

7         THE COURT:  Well, that's something Mr.

8    Blevins will have to figure out for himself.

9         MR. DAVIDSON:  It may be in Xavier Jointer's

10   best interest --

11        MR. FOREMAN:  It's certainly in Xavier

12   Jointer's best interest at this point.

13        THE COURT:  Well, that's for Mr. Blevins.  He

14   has to figure that out.

15        MR. FOREMAN:  Judge, I would ask under -- I

16   know that we've picked a jury at this point, but

17   under the circumstances -- This is exactly what I

18   was afraid of when I asked for the motion to

19   consolidate, that this was going to happen.  And

20   that's why I asked to do that.

21        I would ask that we continue this to the

22   Xavier Jointer's court date, which is the next

23   trial term.

24        THE COURT:  No, the jury has been sworn now.

25   So perhaps jeopardy has attached.  He'll just have
```

1    to go on through the trial.  That's up to Mr.

2    Blevins if he feels he can do it, he has to figure

3    that out.

4         MR. FOREMAN:  I mean, at this point if Mr.

5    Blevins gets up representing Mr. Jointer and says

6    it's not his drugs, that's being dishonest with

7    the Court.

8         THE COURT:  Well, then, that's a question

9    I'll have to deal with at the time.  Okay?

10        MR. BLEVINS:  I guess, in my defense, I have

11   an obligation to represent both clients and raise

12   reasonable doubt based on the evidence and the

13   inferences from the evidence.  If he's claiming it

14   was Santa Clause's drugs, and that's a reasonable

15   defense, that's my option.  I have the option of

16   presenting a defense based on the evidence

17   regardless of who I'm representing.

18        THE COURT:  I will tell you this, though, I

19   will tell you this:  If you represent Jointer and

20   if that case goes to trial, and he has a right to

21   go to trial, and you come in and say that those

22   drugs belong to anybody else other than Jointer

23   and does not belong to Jointer, now, that's going

24   to really raise a question that I will have to

25   decide what to do, to be honest with you.

34

1       So it's up to you to decide how you represent

2      these folks.  I'm not going to take a position at

3      this stage.  But there may come a time when I have

4      to take a position; and I'll just have to deal

5      with that.

6         MR. FOREMAN:  Judge, I'd like to say for the

7      record, too, I've informed Mr. Blevins, when I

8      found out he was representing both of these

9      codefendants --

10         THE COURT:  Not so loud, now.

11         MR. FOREMAN:  -- and asked me if I was

12      planning on proceeding against both of them, I

13      informed them that if one of them was going to

14      take responsibility for it, the case would be

15      nol-prossed against the other one.  And it seems

16      to me from what Mr. Blevins is saying, that Mr.

17      Jointer is accepting responsibility at this point.

18         MR. BLEVINS:  Mr. Jointer has pled not

19      guilty.  It's y'all's job to prove him guilty.

20         THE COURT:  Well, but, Blevins, if you stand

21      up as an officer of the court, and put in this

22      record -- now, we'll have the record -- that these

23      drugs belonged to Jointer; you come in here to

24      represent Jointer, and you say the drugs don't

25      belong to Jointer, now, that's a real problem, and

35

```
 1          even you know that raises some questions.  And how
 2          to resolve that issue is just a matter I'll have
 3          to deal -- I'll have to resolve later.
 4               We're going to proceed on the trial now.
 5          That's what we'll do.
 6               All right.  Come on.
 7                    (The in camera proceedings were
 8                    concluded, and the following  proceedings
 9                    were held in open court, in the presence
10                    of the jury:)
11          THE COURT:  Call your first witness.
12          MR. FOREMAN:  The State calls Sergeant
13     Drummond.
14                         MICHAEL DRUMMOND,
15     the witness, after having first been duly sworn to
16     speak the truth, the whole truth, and nothing but the
17     truth, testified as follows:
18                       DIRECT EXAMINATION
19     BY MR. FOREMAN:
20     Q.   State your name, please.
21     A.   Michael Drummond, D-r-u-m-m-o-n-d.
22     Q.   Where are you employed?
23     A.   With the Montgomery Police Department,
24     specifically the special operations division,
25     narcotics bureau.
```

```
 1   Q.   And how long have you been employed there?
 2   A.   With the City of Montgomery, 15 years, and then
 3   Narcotics, since January of '94.  So a little over 12
 4   years.
 5   Q.   Okay.  I want to take you back to July 20th of
 6   2005.  You were employed at that time?
 7   A.   Yes, sir.
 8   Q.   Okay.  And during the course of your duties that
 9   day, did you have occasion to come into contact with
10   Carlos Williams?
11   A.   Yes, sir, I did.
12   Q.   Okay.  And was this -- Did you come in contact
13   with him at the Residence Inn on Hilmar Court?
14   A.   Yes, sir, I did.
15   Q.   Is that in Montgomery County?
16   A.   Yes, sir, it is.
17   Q.   Can you tell us what you were doing there that
18   day?
19   A.   Yes, sir.  I was conducting surveillance on a
20   reverse drug buy, a buy-bust that we had set up.  And
21   he came around with a first vehicle.  He was the
22   second vehicle in line.
23   Q.   Let me just stop you.  You say a reverse drug buy.
24   Can you explain what that is.
25        MR. BLEVINS:  Judge, if I could object;
```

37

```
 1        relevance.
 2              THE COURT:  Overruled.
 3    Q.   You can go ahead.
 4    A.   An undercover officer had talked to another
 5    subject about purchasing a kilogram of cocaine.
 6              MR. BLEVINS:  Objection.
 7              THE COURT:  Overruled.
 8              MR. BLEVINS:  Hearsay.
 9              THE COURT:  Overruled.
10              MR. BLEVINS:  Move to strike.
11              THE COURT:  Overruled.
12    Q.   Continue.
13    A.   -- about purchasing a kilogram of cocaine.  The
14    deal was set up.  The subject came by the first time
15    and then left and came back again.  And when he came
16    back again, the defendant was in the second vehicle.
17    Q.   Okay.  So basically -- I'm just trying to
18    clarify -- there was going to be a kilo of cocaine
19    sold to an individual?
20    A.   Yes, sir.  We were going to try and sell a kilo of
21    cocaine.
22    Q.   And do you know that individual's name?
23    A.   That was going to purchase it?
24    Q.   Uh-huh.
25    A.   Cleveland Jointer.
```

38

```
 1    Q.   Okay.  And you say he left.  Do you know why he

 2    left?

 3    A.   He left.  He told the undercover officer that --

 4              MR. BLEVINS:  Objection; hearsay.

 5              THE COURT:  Sustained.

 6    Q.   Don't testify to anything that was -- anyone said

 7    other than what you know of your own personal

 8    knowledge.

 9    A.   All right.

10    Q.   But at some point he left; is that correct?

11    A.   Yes, sir.  He left to get more money.

12              MR. BLEVINS:  Objection.  Move to strike --

13              THE COURT:  Overruled.

14              MR. BLEVINS:  -- based on hearsay.

15              THE COURT:  Overruled.

16    Q.   All right.  So he left.  Did he leave in an

17    automobile?

18    A.   Yes, sir.

19    Q.   Okay.  Do you remember what kind of automobile he

20    was in?

21    A.   I believe it was a 626 Mazda.

22    Q.   And you say that you were -- he was under

23    surveillance at the time?

24    A.   Yes, sir, he was.

25    Q.   Okay.  And you were surveilling him?  You had him
```

39

1  under surveillance?

2  A.  I stayed at the Residence Inn.  There were other

3  officers that followed him.

4  Q.  Okay.  Do you know approximately how long he was

5  gone?

6  A.  Just a few minutes.

7  Q.  Okay.  And he came back.  So in a few minutes he

8  came back; is that what you testified to?

9  A.  Yes, sir.  He came back with another car following

10  him.

11  Q.  Okay.  And was this car right behind him?

12  A.  Yes, sir, right behind him.

13  Q.  Okay.  What did the two cars do when they pulled

14  in?

15  A.  First car pulled into a parking space.  There was

16  not a parking space next to him.  I think the next

17  parking space was about three spaces down.  Defendant

18  pulled his vehicle and parked there.

19  Q.  So they pulled in as close as they could to

20  Cleveland Jointer's car?

21  A.  Yes, sir.

22  Q.  What, if anything, did you do at that point?

23  A.  Then Special Agent Neil Thompson was with me.  We

24  went to the defendant's vehicle.  He went to the

25  passenger side; I went around to the driver's side.

```
 1   Q.   Where was the defendant?

 2   A.   He was in the driver's -- driver's seat.

 3   Q.   You went to the driver side?

 4   A.   Yes, sir.

 5   Q.   Okay.

 6   A.   I told him to exit the vehicle; had him exit the

 7   vehicle; placed him under arrest; looked back in the

 8   vehicle, and observed a quantity of what appeared to

 9   be crack cocaine.

10   Q.   Now, you say you had him exit the vehicle.  Is

11   that -- Were you suspicious they were involved with

12   Cleveland Jointer?

13   A.   Yes, sir.

14   Q.   You said you had noticed a quantity of cocaine.

15   Where did you see the cocaine?

16   A.   It was a Honda.  And on the dashboard, there's a

17   little hole cut out there where you could put change

18   or other items in there, and it was in there.

19   Q.   Okay.  So it was on the center console?

20   A.   On the dashboard.

21   Q.   On the dashboard.

22   A.   Yes, sir; to the right of the steering wheel.

23   Q.   All right.  And you said it was in a little

24   compartment?

25   A.   In an open compartment.
```

41

Q.   So it wasn't covered; it was in plain view?

A.   Yes, sir.

Q.   Now, you say it was a Honda.  Is that a

small-sized car, a medium-sized car?

A.   Small to medium.

Q.   Okay.  So about how far from the driver's seat

where the driver would be sitting is it to where that

cocaine was sitting?

A.   Just within reach.

Q.   So it was just --

A.   He could put his hand out and get it.

Q.   And it was in plain view right there?

A.   Yes, sir.

Q.   I want to show you what has been marked as State's

Exhibit 1, and ask you if you can identify that,

please.

A.   This is the packaging the drug evidence was put

in, and submitted by Detective Bartlett to DFS.

Q.   Can you -- Can you look inside there to see --

A.   I've got to open it.

     (Opening exhibit.) Yes, sir.

Q.   Is that -- Can you tell me what that is?

A.   Yes, sir.  It's what I turned over to Detective

Bartlett when I found it inside the vehicle.

Q.   Okay.  So you saw that sitting right in arm's

42

```
 1    reach right in front of the defendant?
 2    A.   Yes, sir.
 3              MR. FOREMAN:  No further questions.
 4              THE COURT:  All right.  Cross-examination.
 5                      CROSS-EXAMINATION
 6    BY MR. BLEVINS:
 7    Q.   Sir, is it Officer Drummond, Sergeant Drummond or
 8    what?
 9    A.   Sergeant.
10    Q.   Sergeant Drummond, this drug deal that you talked
11    about that was going to take place on July 20th, the
12    person that was involved in that drug deal was an
13    individual named Cleveland Jointer; is that right?
14    A.   He was one of them, yes, sir.
15    Q.   All right.  And what was your involvement in this
16    drug deal?
17    A.   I was supervising and assisting in surveillance.
18    Q.   Okay.  So were you there, present at the scene
19    when the first attempt was made to consummate this
20    drug deal?
21    A.   I was outside.  I wasn't inside.
22    Q.   All right.
23    A.   But I was in the area.
24    Q.   And you recognized the person who was there as
25    Cleveland Jointer, correct?
```

43

1    A.    From the name of Cleve.    That's what we had to

2    work with in the beginning.    I believed it to be

3    Cleveland Jointer.    We later identified him as

4    Cleveland Jointer.

5    Q.    All right.    And this drug deal was taking place

6    where?

7    A.    Residence Inn; at the hotel.

8    Q.    All right.    And about what time was it that the --

9    Cleveland Jointer showed up there for this drug deal?

10   A.    I don't recall the exact time.    I'd have to look

11   back at the sup.

12   Q.    Okay.    Do you remember it being daytime or

13   nighttime?

14   A.    Daytime.

15   Q.    All right.    And so in effect, law enforcement was

16   trying to sort of set up Cleveland Jointer out there

17   at the motel that day, correct?

18   A.    We were going to do a buy-bust.

19   Q.    All right.    And you know today that Cleveland

20   Jointer is the brother of Xavier Jointer, correct?

21   A.    Yes, sir.

22   Q.    Now, you testified that Cleveland Jointer's

23   vehicle, which was a Mazda, left the motel area,

24   correct?

25   A.    Yes, sir.

44

1   Q.   All right.  And returned a few minutes later?

2   A.   Yes, sir.

3   Q.   Did you see where it went when it left?

4   A.   Personally, I did not.

5   Q.   Okay.  So you don't know what Cleveland Jointer

6   was doing while he was gone from the motel, correct?

7   A.   Yes, sir, I do.

8   Q.   Okay.  You do based on what somebody else told

9   you, correct?

10  A.   What other officers observed, yes, sir.

11  Q.   Okay.  All right.  And the purpose of Cleveland

12  Jointer leaving was to go retrieve some money; is that

13  right?

14  A.   Yes, sir.

15  Q.   All right.  And so as Cleveland Jointer returned

16  back to the motel, was he still in the Mazda?

17  A.   Yes, sir.

18  Q.   All right.  What color Mazda was it?

19  A.   I don't recall right offhand.  I think it was a

20  gold color.

21  Q.   Was he alone in the vehicle?

22  A.   I don't recall.  I zeroed in on the defendant's

23  vehicle.

24  Q.   Cleveland Jointer was the person that was supposed

25  to be coming back to make this drug buy that y'all

45

1    were out there trying to set him up on, right?

2    A.    Yes, sir.

3    Q.    And you weren't focused on the vehicle that

4    Cleveland Jointer was in?

5    A.    No, sir.  It was another team of officers that was

6    going to stop them.

7    Q.    Who were the officers involved in that, that was

8    supposed to be stopping Cleveland Jointer?

9    A.    It was Lieutenant Roberts and some of the Strike

10   Force members.

11   Q.    All right.  So as Cleveland Jointer's vehicle was

12   coming in and the other officers are watching, you're

13   focused on Mr. Williams' car, correct?

14   A.    When they parked -- he parked, and then Mr.

15   Williams passed them and then parked about two or

16   three spaces further, yes, sir.

17   Q.    All right.  And this roadway that the Mazda drove

18   down, and the Mazda that Mr. Williams drove down, was

19   a public roadway, wasn't it?

20   A.    No, sir.  It's a private parking -- Well, it's the

21   parking lot for the motel.

22   Q.    Well, that's the road that customers coming to the

23   motel, drive into the motel on, isn't it?

24   A.    Yes, sir.

25   Q.    That's the road that you drove in on going to the

46

```
 1    motel when you went there to do the drug deal, wasn't
 2    it?
 3    A.    Yes, sir.
 4    Q.    All right.  So there was nothing unusual about the
 5    vehicle driving down that road, was there?
 6    A.    Not -- they were coming together.
 7    Q.    Okay.  All right.  And the vehicle pulled into the
 8    motel and parked several spaces away, correct?
 9    A.    Approximately three, I believe.
10    Q.    Okay.  Did you see the occupants of the vehicle
11    have any interaction with each other there at the
12    motel?
13    A.    No, sir.  I didn't have the opportunity.
14    Q.    All right.  And Xavier Jointer was in the second
15    vehicle on the front passenger side, correct?
16    A.    He was with the defendant on the passenger side.
17    Q.    All right.  So is it true that after Mr. Williams'
18    Honda pulled into a parking space, you and the other
19    officers immediately surrounded the car with your
20    weapons drawn?
21    A.    Agent Thompson and I did.
22    Q.    Okay.  So y'all were pointing weapons at the
23    people in Mr. Williams' car, correct?
24    A.    I don't recall, but it's a good possibility.
25    Q.    Well, where would you be pointing your weapon if
```

```
 1    it was drawn other than at the people in the car?
 2    A.   Do what?
 3    Q.   Well, where else would you be pointing your weapon
 4    other than at the people in the Honda?
 5    A.   Well, if I had my gun out, it would be in that
 6    direction.
 7    Q.   Are you telling us you don't recall if you had it
 8    out?
 9    A.   Exactly.
10    Q.   You don't know if you had your gun out or not when
11    you surrounded this car?
12    A.   I don't recall.
13          MR. FOREMAN:  Judge, he's already answered
14    that.
15          THE COURT:  All right.  Go ahead.  Next
16    question.
17          MR. BLEVINS:  All right.
18    Q.   All right.  Well, at some point, Mr. Williams was
19    removed from the Honda, wasn't he?
20    A.   Yes, sir.
21    Q.   You had your gun out when you removed him from the
22    car?
23    A.   I don't recall if I did or not.
24    Q.   Did you ever take your gun out out there that day?
25    A.   I don't remember, sir.  I got him out of the
```

48

```
 1    vehicle.  I don't know if I had my gun out of the
 2    holster or not.
 3    Q.   Okay.  All right.  Now, this Honda that Mr.
 4    Williams was in.  You know he's not the registered
 5    owner of that vehicle, don't you?
 6    A.   No, sir, I don't.
 7    Q.   You don't know that?
 8    A.   I don't know if he is or not.
 9    Q.   You never run a check on the Honda to see who
10    owned the Honda?
11    A.   I'm sure the case agent did.  I didn't.
12    Q.   Okay.  Now, at the point that you surrounded the
13    car and you and the other officer, whether you had
14    your gun drawn or not, you gave some commands -- or
15    officers gave commands to people in that Honda, didn't
16    they?
17    A.   I asked them to step out of the vehicle; told him
18    to put his hands up where I can see them, and then
19    step out.
20    Q.   You told that to both occupants, being Mr.
21    Williams and Xavier Jointer?
22    A.   Well, I went around --
23    Q.   Sir, my question was, did you tell that to both
24    Mr. Williams and Mr. Jointer?
25    A.   I said it, you know.  If both of them heard me, I
```

49

1   don't know.

2   Q.   All right.

3   A.   It was directed at the vehicle.

4   Q.   Mr. Williams complied with your command, didn't

5   he?

6   A.   I believe so.

7   Q.   Okay.  You told him to put his hands up.  He put

8   his hands up, didn't he?

9   A.   I guess so.

10  Q.   You don't remember?

11  A.   If he did or not.

12  Q.   You don't remember one way or the other if he

13  complied with your commands to put his hands up?

14  A.   I don't remember if he put his hands up or not;

15  no, sir.

16  Q.   Let's try -- Did you tell him to get out of the

17  car?

18  A.   Yes, sir.

19  Q.   Did he comply with your command to get out of the

20  car?

21  A.   Yes, sir.

22  Q.   All right.  You also gave the command to Jointer

23  to put his hands up, didn't you?

24  A.   I believe Agent Thompson was talking to him.

25  Q.   All right.  Xavier Jointer refused to comply those

50

```
 1    commands, didn't he?
 2    A.   I believe Agent Thompson said it several times.
 3    Q.   All right.  And Xavier Jointer continued to keep
 4    his hands down, fidgeting with something in the car,
 5    didn't he?
 6    A.   I'm not sure where exactly his hands were.  But I
 7    think he said that his hands were down.
 8    Q.   Okay.  Down like he was up to something, right,
 9    trying to hide something?
10         MR. FOREMAN:  Judge, objection; calls for
11      speculation.
12         THE COURT:  Only if the officer observed.
13      And he can testify to what he observed.
14      Just ask the question.  Don't testify, Mr.
15      Blevins.
16         MR. BLEVINS:  Yes, sir.
17    Q.   He was acting as though, based on your experience
18    and training that he was trying to hide something,
19    wasn't he?
20    A.   Possibly could have.
21    Q.   Because a lot of times as a law enforcement
22    officer when you come upon somebody in a vehicle and
23    they have drugs, they'll not comply with commands and
24    fidget around, trying to conceal drugs in the car,
25    won't they?
```

51

```
1    A.    It's a possibility.

2    Q.    You've encountered that before, haven't you?

3    A.    Yes, sir.

4    Q.    All right.  And so the drugs that were found in

5    the car, how far were they from Xavier Jointer?

6    A.    Probably an arm's length away.

7    Q.    About the same distance as the drugs were for

8    Carlos Williams?

9    A.    Probably a little closer to Mr. Williams.

10   Q.    All right.  When you removed Mr. Williams from the

11   car, was there any drugs found on him, cocaine,

12   marijuana, any kind of drugs whatsoever?

13   A.    No, sir.

14   Q.    The drugs that were found, the cocaine, was it in

15   some kind of bag, or was it just laying out in the

16   open?

17   A.    It was in a clear plastic bag.

18   Q.    All right.  And you're able in some instances to

19   lift fingerprints off plastic bags, aren't you?

20   A.    I've never been able to.

21   Q.    Well, have you ever submitted in the past plastic

22   bag type material for fingerprint examination?

23   A.    Yes, sir, I have.

24   Q.    All right.  Did you submit this bag that this

25   cocaine was in for fingerprint examination?
```

52

```
 1   A.    I did not.  I gave -- turned the drug evidence
 2   over to Bartlett, Detective Bartlett.  But I wouldn't
 3   have turned it in.
 4   Q.    Who would have requested fingerprint examination
 5   if it was requested?
 6   A.    Detective Bartlett.
 7   Q.    All right.  Is it -- Would it be fair to say,
 8   Officer, that you have no personal knowledge one way
 9   or the other as to whom that cocaine belonged to, do
10   you?  Personal knowledge.
11   A.    Remember I -- It was in the vehicle.  The two
12   subjects were in the vehicle.
13   Q.    So what, you concluded the cocaine belonged to
14   both of them?
15   A.    It's a possibility.
16   Q.    It's a possibility.  Okay.  I take it since you
17   arrested Xavier Jointer as well, then you charged him
18   with possessing that cocaine, didn't you?
19   A.    Yes, sir.
20   Q.    You arrested Carlos Williams and charged him with
21   possessing that cocaine, didn't you?
22   A.    Yes, sir.
23   Q.    All right.  Now, is it true that if there had been
24   three or four people in that car, you would have
25   arrested every one of them --
```

53

```
 1              MR. FOREMAN:  Objection, Judge.
 2   Q.  -- and charged them with --
 3              THE COURT:  Sustained.
 4              All right.  Any further questions which
 5        touches on this case, Mr. Blevins?
 6              MR. BLEVINS:  Yes, sir.  If I could have just
 7        a second here.
 8   Q.  Did you see -- Based on your observations, did you
 9   see either individual, Xavier Jointer or Carlos
10   Williams with their hand on that cocaine?
11   A.  No, sir.
12   Q.  Okay.
13              THE COURT:  All right.  Any further
14        questions?
15              MR. BLEVINS:  No, sir.  That will do it.
16              THE COURT:  All right.  Any redirect?
17              MR. FOREMAN:  Just briefly, Judge.
18                   REDIRECT EXAMINATION
19   BY MR. FOREMAN:
20   Q.  I just want to get back briefly to where the drugs
21   were located.  You said they were closer to Carlos
22   Williams; is that correct?
23   A.  Yes, sir.
24   Q.  And you say they were just with a very short arm's
25   reach away?
```

54

```
1    A.   Yes, sir.  When I got out of the vehicle, I went
2    around.  I was directly behind the vehicle, and walked
3    around.  I didn't see anybody reach up towards that --
4    that little cubbyhole is what I call it.
5    Q.   Now, from where the drugs were sitting, would the
6    person in the driver's seat be able to see those
7    drugs?
8              MR. BLEVINS:  Objection.
9    A.   Yes, sir.
10              MR. BLEVINS:  Calls for speculation.
11              THE COURT:  Overruled.
12    A.   Yes, sir, it's plainly visible.
13    Q.   And would they easily have been able to exercise
14    control over it?
15              MR. BLEVINS:  Objection.
16              THE COURT:  Overruled.
17    A.   Yes, sir.
18    Q.   Now, just briefly.  Mr. Blevins was asking you
19    about submitting the little Saran Wrap plastic or
20    whatever for fingerprint testing?
21    A.   Yes, sir.
22    Q.   I believe you said that you don't commonly get
23    prints off that; is that correct?
24    A.   Yes, sir.  I've submitted several, several,
25    several bags even larger, much larger than that.  And
```

55

```
 1    I think one time in -- I've ever heard of fingerprints
 2    coming back on a bag that we submitted, and it wasn't
 3    mine.
 4    Q.   So it's not -- it's not common at all for prints
 5    to be lifted?
 6    A.   No, sir; specifically something that small.
 7         MR. BLEVINS:  Objection, unless the witness
 8    is an expert.
 9         THE COURT:  Sustained.
10         Go ahead.  Next question.
11         MR. FOREMAN:  No further questions.
12         THE COURT:  All right.
13                  RECROSS-EXAMINATION
14    BY MR. BLEVINS:
15    Q.   Now, Officer, when were the drugs placed in the
16    console?
17    A.   I couldn't tell you.
18    Q.   You don't know if they were just placed in the
19    console after you surrounded the car or not, do you?
20    A.   Once I got out of the vehicle and started
21    approaching the vehicle, I can tell you they
22    weren't doing that.  Nobody leaned or nobody made a
23    motion toward that console.
24    Q.   Okay.  So your testimony is, you were watching
25    Xavier Jointer the whole time after you surrounded the
```

```
 1   car; is that right?
 2   A.   (No response.)
 3   Q.   Is that right?
 4   A.   I was watching both the subjects as I came around;
 5   yes, sir.
 6   Q.   All right.  And so are you telling this jury that
 7   if Xavier Jointer while he was fidgeting around had
 8   thrown that cocaine up in that console, you would have
 9   seen it?  Is that what you're telling the jury?
10   A.   I can tell you that he's didn't reach towards it.
11           THE COURT:  All right.  Any further
12        questions?
13           MR. BLEVINS:  Yes, sir.
14   Q.   Do y'all have a policy at the police department
15   that if you stop a vehicle and drugs are found in it,
16   that you arrest everybody in the vehicle and charge
17   them with the drugs?  Is that a policy?
18   A.   No, sir.
19   Q.   Is that something you do?
20   A.   No, sir.
21   Q.   All right.  So it would be uncommon if you stopped
22   a vehicle and there's drugs in it for you to arrest
23   everybody in the car, correct?
24   A.   Depends on the investigation.  You investigate.
25   Q.   Okay.  And you're aware that Xavier Jointer is
```

57

1    going to trial for possessing the same cocaine on May

2    15th of this month, aren't you?  You're aware of that?

3    A.   I -- He was arrested.  I'm not sure about the

4    trial or anything.

5    Q.   Okay.  Let me show you a photograph --

6         MR. FOREMAN:  Judge, I'm going to object to

7         any type of photographic evidence.  I haven't

8         been -- I haven't seen it; don't know anything

9         about it.

10        MR. BLEVINS:  Here you go.

11             (Mr. Blevins shows the exhibit to

12             opposing counsel.)

13        MR. FOREMAN:  And somebody is going to have

14        to testify to this to verify what it is.

15        THE COURT:  What is it?

16        MR. BLEVINS:  I'm going to authenticate it

17        through this witness.

18   Q.   (By Mr. Blevins)  Let me show you what I'm going

19   to mark as Defendant's Exhibit 1.

20             (Defendant's Exhibit Number 1 was marked for

21             identification.)

22   Q.   And can you tell the ladies and gentlemen of the

23   jury if you recognize what's in that photograph?

24   A.   The dashboard of a vehicle.

25   Q.   Do you recognize that as the interior dashboard of

58

1  the Honda that you removed Carlos Williams from?

2  A.  No, sir.

3  Q.  Is that the same color of the vehicle?  Do you

4  know?

5  A.  It just shows an interior.  I can't -- don't

6  recall the interior.  The outside was a brown.

7  Q.  Okay.  Let me show you what I'm going to mark

8  as --

9        MR. FOREMAN:  Judge, I haven't seen this

10    picture either.

11       MR. BLEVINS:  Judge, I'll show it to them as

12    soon as I mark it.

13          (Defendant's Exhibit Number 2 was marked

14         for identification.)

15  Q.  Okay.  Let me show you what I've marked as

16  Defendant's Exhibit 2.  Do you recognize that as the

17  Honda that you removed Mr. Williams from?

18  A.  That could possibly be it.

19  Q.  You don't know if that's the vehicle or not?

20  A.  It's a brown colored Honda.  I can't tell you if

21  it's the same vehicle or not, no, sir.

22  Q.  Well, how is it a moment ago you were able -- so

23  quick to determine this was the cocaine that came out

24  of the car?

25  A.  Through the chain of custody.

59

```
1   Q.   You hadn't had this cocaine in your possession
2   since it was taken out of the car, have you?
3            MR. FOREMAN:  Judge, I'm going to object to
4        this.  He testified he collected the cocaine and
5        he gave it to Detective Bartlett.
6            THE COURT:  I'll sustain the objection.
7        First of all, the chain of custody is the lineup
8        and who had the possession of the cocaine.
9            MR. FOREMAN:  I also object to anymore
10       questioning about these photographs.  He's not
11       going to be able to authenticate it.  He said
12       that -- I mean, there's hundreds of Honda Accords
13       around.
14            THE COURT:  This witness is saying he can't
15       recognize, can't authenticate.  You may have
16       another witness can do so.  Until that time, I'll
17       sustain the objection; move on with the next line
18       of questions.
19            MR. BLEVINS:  Okay.  Judge, if I can show you
20       Exhibit 3.
21   Q.   Are you familiar with the tag number that was on
22   the Honda that you removed Mr. Williams from?
23            MR. FOREMAN:  Judge, I haven't seen that
24       either.  May I approach?
25            THE COURT:  You may approach.
```

60

```
 1                    (There was a sidebar conference; not
 2                    reported.)
 3    Q.  Are you familiar with the tag number of the
 4    vehicle?
 5    A.  I don't recall it offhand.  It would be back in
 6    Detective Bartlett's Supplemental Offense Report.
 7              THE COURT:  All right.  Any further
 8         questions?
 9              MR. BLEVINS:  No, sir.
10              THE COURT:  All right.  Do you have any
11         questions?  Can this witness step down?
12              MR. FOREMAN:  Yes, sir, he can step down.
13              THE COURT:  All right.  Step down.  Wait in
14         the witness room.
15         Call your next witness.
16              (The witness stepped down.)
17              MR. FOREMAN:  I call Special Agent Neil
18         Thompson.
19              THE COURT:  Take the stand.
20                    THOMAS NEIL THOMPSON,
21    the witness, after having first been duly sworn to
22    speak the truth, the whole truth, and nothing but the
23    truth, testified as follows:
24                    DIRECT EXAMINATION
25    BY MR. FOREMAN:
```

61

```
 1    Q.   Can you state your name, please?

 2    A.   Thomas Neil Thompson.

 3    Q.   And where are you employed?

 4    A.   With the Department of Justice; the Drug

 5    Enforcement Administration.

 6    Q.   What is your job there?

 7    A.   I'm a special agent.

 8    Q.   Okay.  How long have you been employed there?

 9    A.   8 years.

10    Q.   8 years?

11    A.   Yes, sir.

12    Q.   Now, did you have occasion on July 20, 2005, to

13    come into contact with Carlos Williams?

14    A.   Yes, sir.

15    Q.   Can you tell us about how you came in contact with

16    him?

17    A.   I was asked by the detective assigned to the

18    Montgomery Police Department, special operations unit,

19    to assist them in a -- what's called an undercover

20    reverse operation.

21         MR. BLEVINS:  Judge, I'm going to object to

22         the narrative testimony.

23         THE COURT:  That's not narrative.  He just

24         answered the question.

25         Next question.
```

62

1   Q.   Okay.  So you were asked to help them with an

2   undercover drug operation; is that correct?

3   A.   Yes, sir.

4   Q.   What kind of operation was it?

5   A.   A reverse operation.

6   Q.   Can you tell us what that means?

7   A.   A reverse operation is basically when the target

8   of the investigation is an actual buyer of drugs;

9   seeking to buy usually a large quantity of drugs

10   instead of being the purchaser.

11   Q.   Okay.  And what was your role in this?

12   A.   I was there just assisting in the investigation;

13   providing manpower, and also anytime that there's a

14   quantity of drugs that might be -- fit/fail guidelines

15   to be prosecuted in federal court, I try to be there

16   and assist them in case it does get prosecuted in

17   federal.

18   Q.   Now, did this take place at the Residence Inn on

19   Hilmar Court?

20   A.   Yes, sir.

21   Q.   Now, you say at some point you came in contact

22   with Carlos Williams.  Can you tell us at what point

23   you came in contact with him, how that came about?

24   A.   Yes, sir.  During the investigation, we were told

25   that the --

63

```
 1              MR. BLEVINS:  Objection; hearsay.
 2              THE COURT:  Sustained on what you were told.
 3    Q.   Yes.  Not on what you were told, but at some
 4    point -- At some point you did come in contact with
 5    Carlos Williams?
 6    A.   I did, yes, sir.
 7    Q.   Okay.  And what point did you come in contact with
 8    him?
 9    A.   When the car he was driving pulled into the
10    Residence Inn, the back of the parking lot.
11    Q.   Okay.  So the Residence Inn was -- All right.  His
12    car was pulled into the Residence Inn?  Was his car
13    the only car that pulled in at that time?
14    A.   No, sir.
15    Q.   And who did the other car belong to?
16    A.   I don't remember.  I just remember Cleve was the
17    name.
18    Q.   Cleveland Jointer?
19    A.   Yes.  Yes, sir.
20    Q.   Is that who you were doing the reverse drug buy
21    with?
22    A.   He was the target, I was told.
23    Q.   Okay.  So Carlos Williams' car pulled into the
24    Residence Inn behind Cleveland Jointer's car; is that
25    correct?
```

64

```
 1    A.    I believe so, yes.
 2    Q.    Okay.  And what did Mr. Williams' car do at that
 3    time?
 4    A.    The car, it was a Honda, if I remember correctly.
 5    It pulled into a parking place on the backside of the
 6    apartments.  I'm sorry.  They look like apartments;
 7    the hotel, the Residence Inn.  They pulled on the
 8    backside, which would be the north side; the farthest
 9    side away from, I guess that's Carmichael Road.
10    Q.    Okay.  So it pulled in -- That car pulled in?  Was
11    the defendant in that car?
12    A.    Yes, sir.  He was the driver.
13    Q.    Do you see the driver of that car in the courtroom
14    today?
15    A.    Yes, sir.
16    Q.    Can you point to him and identify something he's
17    wearing?
18    A.    He's seated at the defense table, wearing a dark
19    colored suit.
20          MR. FOREMAN:  Judge, let the record reflect
21       he's identified the defendant.
22          THE COURT:  Let the record so reflect.
23    Q.    Okay.  So once that car pulled in, what, if
24    anything, did you do at that time?
25    A.    I approached the car on the passenger side.  I
```

65

1  was -- had markings clearly identifying that 1 was the

2  police.  And I approached the car on the passenger

3  side.  Sergeant Drummond and I were riding together,

4  and he approached the car on the driver's side.

5  Q.   Okay.  When you approached on the passenger side,

6  was there someone else in the passenger seat?

7  A.   Yes.

8  Q.   All right.  Now, how -- What was the period of

9  time from the time Carl pulled into the lot until you

10  approached the car?  He pulled in the parking space,

11  right?

12  A.   The parking space because the lot's long.  The

13  parking space, it would have been just a matter of

14  seconds; probably -- maybe 20 seconds, I guess.

15  Q.   Okay.  Now, when you approached the car, what, if

16  anything, did you observe?

17  A.   I had my attention focused on the passenger since

18  I was on his side; Mr. Jointer, Xavier Jointer.  And I

19  told him to put his hands up; put his hands up.

20       It took him several seconds, longer than I thought

21  was necessary to comply with my commands.  At one

22  point he did put his hands up, and I escorted him from

23  the car.

24  Q.   Now, you said he had his hands down.  At any

25  point -- You were observing the car.  How close were

66

1  you to the car?

2  A.  Almost within an arm's length; probably four or

3  five feet.

4  Q.  So you were right on top of him?

5  A.  Yes, sir.

6  Q.  So you had a clear view of Xavier Jointer?

7  A.  Yes, sir.

8  Q.  Okay.  At any point did you see Xavier Jointer

9  place anything in the console of the car?

10  A.  No, sir.

11  Q.  Okay.  Now, you say he had his hands down.  Were

12  you close enough to the car to see that his hands were

13  not moving toward the console, or whether they were

14  moving toward the console?

15  A.  I never saw his hands move.  They were just down

16  the whole time.  And this part of the door, I couldn't

17  see what they were doing.  But if -- If he would have

18  moved them, I would have been able to see that.

19  Q.  Okay.  What, if anything, did you do at that

20  point?

21  A.  We got both of the occupants out of the car, and

22  they were secured.  And basically, I was just there in

23  case they needed some kind of assistance.

24  Q.  Now, did you observe any drugs in the car?

25  A.  Yes, sir.

67

```
 1    Q.   Okay.  Where did you observe the drugs?
 2    A.   There was a cutout in the dash of the car, the
 3    front dash of the car.  I guess some cars don't have
 4    all the options.  And there was a cutout, just like a
 5    space probably about 3 or 4 inches deep, and about as
 6    big as like maybe a CD player would fit in or
 7    something, just in the dash of the Honda.
 8    Q.   And you observed what you believed to be drugs
 9    there?
10    A.   Yes, sir.
11    Q.   Okay.  Now, was that -- once again, how far away
12    was this where the drugs were from where the driver,
13    Mr. Williams, would be sitting?
14    A.   Well, it's within hand's reach that the dash is
15    right there.  It's the front part of the dash where
16    you would -- like under the radio; in that area.
17    Q.   Now, were the drugs -- were they in plain view
18    where if you were in the car, you would clearly be
19    able to see the drugs?
20    A.   Yes, sir.
21    Q.   Okay.  And you would clearly be able to exercise
22    control over them?
23    A.   Yes, sir.
24            MR. BLEVINS:  Objection.
25            THE COURT:  Overruled.
```

68

1   Q.   I'm going to show you what's marked as State's

2   Exhibit 1, and ask you if you can identify that?

3   A.   Yes, sir.  This looks like the package that was in

4   the -- not the console, but the space in the dash of

5   the car that day.

6   Q.   Okay.

7            MR. FOREMAN:  No further questions.

8            THE COURT:  All right.  Cross-examination.

9                    CROSS-EXAMINATION

10  BY MR. BLEVINS:

11  Q.   Officer Thompson, who put the drugs in the

12  console?

13  A.   I don't know.  It's not a console.  It's a -- It's

14  just a space.

15  Q.   All right.  You don't -- For all you know, Xavier

16  Jointer could have put the drugs there, right?

17  A.   Yes, sir, that's a possibility.

18  Q.   Okay.  Now, this vehicle that Mr. Jointer was in,

19  this was a Honda; is that right?

20  A.   I believe it was -- Mr. -- You're saying Mr.

21  Jointer was in.  Mr. Williams and Jointer --

22  Q.   Yes.

23  A.   It was a Honda.  I believe it was an Accord.

24  Q.   Do you remember what color it was?

25  A.   It was a dark color.  I don't want to say it was

69

1    black.  It was kind of a -- like a brown or something,

2    it seems like.

3    Q.   Let me show you what I've previously marked as

4    Defense Exhibit 2.

5    A.   Yes, sir.

6    Q.   And ask if you recognize that as being the

7    vehicle?

8    A.   That looks like a Camry to me.

9    Q.   Okay.  Let me show you Exhibit 3 as well, and see

10   if that helps refresh your recollection.

11   A.   Okay.  Yeah, I recognize the back light; yes, sir.

12   The front side and the side, it's hard to tell, but I

13   recognize the back lights, and it's an Accord, yes,

14   sir.

15   Q.   Okay.  So that picture would fairly and accurately

16   portray the Honda that you removed Mr. Williams from?

17            MR. FOREMAN:  Judge, I'm going to object.  I

18       don't think he's testified that's the exact same

19       car.

20            THE WITNESS:  No.

21            MR. FOREMAN:  And that it exactly represents

22       at the time -- I don't know when this picture was

23       taken, and I don't know if --

24            THE COURT:  Wait a minute.  Let him continue

25       to ask the -- answer the question.

70

```
 1              THE WITNESS:  I thought it was an older
 2        Accord than this.  I don't remember -- I thought
 3        it was older than this.
 4   Q.   Okay.  All right.  Let me show you one final
 5   photograph.  Exhibit 1, and my question to you is,
 6   does that fairly and accurately reflect the interior
 7   of the Honda, the location where you say the drugs
 8   were recovered?
 9   A.   I can't -- I don't know what this is a picture of.
10   I didn't take a picture that day.  I don't know if
11   Montgomery PD did, but this is obviously a dashboard.
12   I don't know if it's the one that day or not.
13   Q.   Okay.  All right.  Let me ask you a few questions
14   on this drug deal that was going on out there that
15   day.  The law enforcement was attempting to sell a
16   substantial quantity of cocaine to Cleveland Jointer,
17   correct?
18   A.   I was -- I don't know if that was the name of
19   the -- the full name of the target or not.
20   Q.   Okay.  Well, let me change the question, then.
21   Law enforcement was trying to sell an individual out
22   there that you knew as Cleve a substantial amount of
23   cocaine that day, correct?
24   A.   Yes, sir.
25   Q.   All right.  And the cocaine was being sold to
```

1   Cleve for the sum of $20,000, correct?

2   A.   Something around that price, yes, sir.

3   Q.   All right.  And Cleve showed up initially and said

4   he had $10,000, right?

5   A.   I don't know about that.

6   Q.   Do you recall Cleve leaving the scene of the motel

7   to go get some more money?

8   A.   I know that he left the scene, yes, sir.  And came

9   back later, yes, sir.

10   Q.   Are you aware that his purpose in leaving was to

11   go get some more money to buy the drugs?

12   A.   I can't say what I was told.  I believe that --

13   either get more money or somebody else had the money,

14   yes, sir.

15   Q.   Okay.  So were you present when Cleveland Jointer

16   on or Cleve's Mazda returned back to the motel after

17   it left?

18   A.   Yes, sir.

19   Q.   All right.  And Cleve was in a Mazda the first

20   time he arrived before he left, correct?

21   A.   It was a gold car.

22   Q.   All right.

23   A.   Yes, sir.

24   Q.   All right.  And after Cleve came back to the

25   motel, he parked in the parking space at the back of

```
 1   the motel, correct?
 2   A.   I don't know what -- The only time I saw him was
 3   when he was backing up and exiting the motel.  I don't
 4   know if he ever parked or not.
 5   Q.   All right.  Is it true that Cleve -- after law
 6   enforcement surrounded Mr. Williams' car, the Mazda
 7   that Cleve was in took off?
 8   A.   That's correct.
 9   Q.   All right.  And law enforcement took off on a
10   chase after Cleve, correct?
11   A.   Yes, sir.
12   Q.   All right.  And during that chase, law enforcement
13   found a bag full of money out in the woods, didn't
14   they?
15   A.   It was in a parking lot in a bush; yes, sir.
16   Q.   Which law enforcement determined had been dropped
17   by Cleve, correct?
18   A.   Yes, sir.
19   Q.   That bag full of money had about $20,000 in it,
20   didn't it?
21   A.   Yes, sir.
22   Q.   All right.  And did you relate that $20,000 in
23   that bag out in the woods being the drug buy money
24   that Cleve was going to buy the cocaine with?
25   A.   That would have been a logical connection; yes,
```

73

```
 1   sir.
 2   Q.   Okay.  So would it also be true that law
 3   enforcement didn't find any money on Carlos Williams
 4   that you link to the purchase of this cocaine, did
 5   you?
 6   A.   No, sir.
 7   Q.   Did you find any money on Xavier Jointer that you
 8   link to the purchase of this cocaine?
 9   A.   No, sir.
10   Q.   All right.  Now, at the point that the Mazda and
11   the Honda came into the motel, is it true that law
12   enforcement surrounded Carlos Williams' Honda?
13   A.   Yes, sir.  It was myself and Sergeant Drummond,
14   and I believe some other members of the SWAT team.
15   Q.   Okay.
16   A.   Yes, sir.
17   Q.   So yourself, personally, you aided in surrounding
18   Mr. Williams' car?
19   A.   Yes, sir.
20   Q.   All right.  Did you have your gun drawn?
21   A.   Yes, sir.
22   Q.   Did Officer Drummond who testified a moment ago,
23   did he have his gun drawn?
24   A.   My focus was on Mr. Jointer.  That would be Xavier
25   Jointer.
```

74

```
1    Q.   Okay.

2    A.   Yes.

3    Q.   Would it be true, then, that at the point you and

4    Officer Drummond surrounded Mr. Williams' car, you had

5    not seen Mr. Williams commit any crime, had you?

6    A.   No, sir.

7    Q.   You had not seen him engage in any illegal

8    activity, had you?

9    A.   No, sir.

10   Q.   All right.  You just surrounded the car because

11   you thought it might have something to do with this

12   drug deal that was going on with Cleve, correct?

13   A.   That's correct.

14   Q.   All right.  And the fact that you didn't find any

15   money in Mr. Williams' car, would lead to the belief

16   that it had no involvement with the drug deal,

17   correct?

18   A.   No, sir.

19   Q.   Okay.  All right.

20   A.   I'm saying no, I don't agree with that.

21   Q.   Okay.  So as you stood at the Honda with the gun

22   drawn, did you observe Mr. Williams complying with

23   Officer Drummond's commands?

24   A.   I didn't observe that.  But I believe he did, yes,

25   sir.
```

75

1   Q.   All right.  And you testified that Xavier Jointer

2   delayed for several seconds in complying with your

3   commands, correct?

4   A.   That's correct.

5   Q.   All right.  And I believe you told the jury you

6   could see everything that Xavier Jointer was doing; is

7   that correct or accurate?

8   A.   No, I don't think I said that.  I said his hands

9   were down, and I couldn't -- couldn't see what he was

10   doing with his hands.

11   Q.   All right.  And you were on the passenger side?

12   A.   Yes, sir.

13   Q.   And the passenger door was closed, correct?

14   A.   It was.

15   Q.   Was his window up or down?

16   A.   I believe it was up.  I'm not sure.  I believe it

17   was up.

18   Q.   And you were four or five feet from the passenger

19   door?

20   A.   Yes, sir.

21   Q.   All right.  Would it be fair to say that you could

22   not see anything occurring in the vehicle on the

23   passenger side of the car below Xavier Jointer's

24   chest?  Would that be fair to say?

25   A.   Somewhere in the midchest, yes, sir.

76

Q.   So you couldn't see the console, could you?

A.   Well, I was standing a little bit to the back, I
guess like in a 4 o'clock position to the car.  And
so, yes, sir, my view is here and towards that way a
little bit.

Q.   Are you telling this jury that it is inconceivable
that Xavier Jointer either threw or placed that
cocaine on that console?  Is that inconceivable?

A.   While I was standing outside the car, I was --
Yes, sir.  I would have seen his hand move up.
Because the console would have been right there.  And
then my vision is right here.  I couldn't see the
hands down here.

Q.   Well, what did you determine he was doing with his
hands?

A.   Never figured it out.

Q.   But he was doing something and not complying with
your command, wasn't he?

A.   Sometimes people are just so -- they don't know
what to do.  And I've experienced that before.  But I
didn't find any contraband in the floorboard or
anything like that.

Q.   All right.  But this was the brother of the person
who was out there to buy $20,000 worth of cocaine,
correct?

77

```
 1   A.    I know he's got the same last name.  I'm not -- I
 2   don't know about that, yes, sir.
 3             THE COURT:  All right.  Any further
 4         questions?
 5             MR. BLEVINS:  Yes, sir, Judge.  May I just
 6         look here one second?
 7   Q.    Let me clarify, Officer.  Were the drugs on top of
 8   the dash, or were they in a console where the
 9   gearshift is?  Where exactly were the drugs?
10   A.    What I remember is, there was a void in the dash
11   there -- in the actual dash; not down here below.
12   Q.    Okay.  Now, I don't want to belabor the point, but
13   this is important.  If I'm sitting in the car, and the
14   gearshift -- I take it the gearshift was in the
15   console, correct?
16   A.    If it had a gearshift, yes, sir.  It -- My wife's
17   got an Accord.  So yes, sir, she's got a gearshift
18   down there.
19   Q.    All right.  So the gearshift is right here.  And
20   were the drugs in the area of the gearshift in the
21   console, or did the console go up the car, and were
22   the drugs somewhere up in the console is what I'm
23   trying to pin down?
24   A.    Yeah, that's -- If I remember right, there's an
25   arm rest here that you can open, and it's got --
```

78

```
 1    That's what I call a console.  And then this would

 2    have been on the dash in a space there.

 3    Q.   Y'all didn't take pictures of the car?

 4    A.   I didn't take any.

 5    Q.   Y'all don't typically photograph, like, the car

 6    where drugs are recovered so you can bring it in and

 7    show it to a jury?

 8    A.   It's commonly done, yes, sir.

 9    Q.   Why didn't y'all do it?

10    A.   I didn't do it.  I don't know if they did it or

11    not.

12    Q.   All right.  This big drug transaction out there

13    for $20,000, did y'all have video surveillance set up

14    on that?

15    A.   Not that I know of.

16    Q.   Don't y'all typically do that on a big drug deal

17    like that?

18    A.   It depends on the situation.

19    Q.   All right.  Was the decision made that this wasn't

20    a situation where you'd want to have video

21    surveillance?

22    A.   Being not a part of the special operations unit, I

23    wasn't part of any of that is decision making.  I

24    don't know if they did or didn't.

25    Q.   Okay.  And the cocaine that was recovered was in a
```

79

```
 1    plastic bag just like it is here in court?  Have you
 2    seen the cocaine?
 3    A.    Yes, sir.  It was in a, I guess you'd call it just
 4    the bottom of a bag or something, tied up.
 5    Q.    Let me let you look at Exhibit --
 6            COURT REPORTER:  2.  It's on the back.
 7            MR. BLEVINS:  Is it okay if I take this out
 8        of the bag?
 9    Q.    Is this the exact way the cocaine was packaged
10    when it was found in the Honda?
11    A.    As I remember it, yes, sir.
12    Q.    Okay.  Do you think if Xavier Joiner was seated in
13    the car and had tossed that up and it landed on the
14    console, you would have seen it?
15    A.    I belive I would have seen something like that,
16    yes, sir.
17    Q.    Okay.
18            THE COURT:  All right.  Any further questions
19        that really go to what we're doing here?
20            MR. BLEVINS:  Yes, sir.  If I can just look
21        one second, Judge, I think I may be finished.
22    Q.    I have just a couple of final questions, Officer.
23    You didn't see Mr. Williams try to run from the scene,
24    did you?
25    A.    No, sir.
```

80

| | |
|---|---|
| 1 | Q.   You didn't find any drugs on him? |
| 2 | A.   No, sir. |
| 3 | Q.   He was cooperative out there, wasn't he? |
| 4 | A.   As far as I know, yes, sir. |
| 5 | Q.   Thank you, sir. |
| 6 | THE COURT:  All right.  Do you have any |
| 7 | questions? |
| 8 | MR. FOREMAN:  Just briefly. |
| 9 | REDIRECT EXAMINATION |
| 10 | BY MR. FOREMAN: |
| 11 | Q.   You didn't find any drugs on Xavier Jointer either |
| 12 | when you got him out of the car, did you? |
| 13 | A.   No, sir. |
| 14 | Q.   All right.  He didn't try to run, did he? |
| 15 | A.   No, sir. |
| 16 | Q.   All right.  Now, he was talking about didn't you |
| 17 | have cameras.  Now, you said you were at the 4 o'clock |
| 18 | position.  So you were looking straight on at that |
| 19 | console, right?  Not the console, but the dashboard. |
| 20 | A.   A little behind.  It's safer to be a little behind |
| 21 | so that if somebody -- if a subject -- they have to |
| 22 | turn to do something to you.  So I was a little |
| 23 | behind. |
| 24 | Q.   So you had a real good view of that dash area. |
| 25 | A.   Through the passenger window, yes, sir. |

81

1    Q.   And at no time did you see Xavier Jointer place

2    anything up there or flip anything up there?

3    A.   No, sir.  Any hand movement would have

4    heightened -- I would have remembered.  That would

5    have heightened my awareness a lot more; any kind of

6    hand movement.  The hand stayed down here.

7    Q.   And is it safe to say that your view that you had

8    would have probably been a better view than any camera

9    they could have had out there?

10   A.   Oh, yes, sir; unless one was attached to me.

11             THE COURT:  Can this witness be excused?

12             MR. BLEVINS:  Judge, if I could ask him one

13        or two, Judge.

14             THE COURT:  Go ahead.

15                    RECROSS-EXAMINATION

16   BY MR. BLEVINS:

17   Q.   Officer, you didn't see Mr. Williams move in the

18   direction of the console either, did you?

19   A.   No, sir.

20   Q.   Okay.  And I had one other question, it's slipping

21   my mind.  Give me just a second.  And I just can't

22   remember it.  Thank you.

23             THE COURT:  All right.  Step down.

24             Can this witness be excused?

25             MR. FOREMAN:  Yes, sir, Judge.

82

1          THE COURT:  You're excused.  You can go about

2     your business.                    .

3               (The witness stepped down.)

4          THE COURT:  Ladies and gentlemen, let's take

5     a recess for lunch now.  During the time you're in

6     recess for lunch, do not discuss the case with

7     anyone.  Do no allow anyone to discuss the case

8     with you.

9          I don't anticipate anything being in the news

10    media about the case.  In case there is, do not

11    read anything, listen to anything, or watch

12    anything if you have access to a television about

13    the case.

14         If you will be in the jury assembly room on

15    the third floor at 1:15, we'll get started around

16    that time.

17         Court is in recess until 1:15.

18              (The jury was placed in recess, after

19              which the following proceedings were

20              held, outside of their presence:)

21         MR. FOREMAN:  Judge, I have something.  I

22    would just like to say that I have a huge problem

23    with what's going on here.  As an officer of the

24    court, you know, I feel like it's my duty to say

25    that Mr. Blevins is representing both defendants.

83

1   All right?  Presumably he's talked to both of

2   guys, and he knows who these drugs belong to.  All

3   right?

4       He's -- I mean, basically, apparently Xavier

5   Jointer has told him the drugs belong to him, or

6   else he's out here making misrepresentations to

7   the Court.  All right?  And I have a huge problem

8   with that.

9       I also have a problem with the fact that I've

10  told him that if in fact the drugs do belong to

11  Xavier Jointer, this guy can be home right now,

12  and this case be dismissed against him.  If he had

13  a different attorney, he could be home right now.

14      MR. BLEVINS:  And, see, Judge, I think I can

15  call him as a witness to testify to that because

16  to establish that they have to no basis to charge

17  both of them.

18      THE COURT:  You can't call him as a witness.

19  They have a basis to charge both of them.  Now,

20  the question, is, though, Mr. Blanchard -- Mr.

21  Blevins, I have -- You know, I have a problem -- I

22  have a question about how you're going to

23  represent both of these defendants, when you're

24  saying the drugs belongs to one or the other.

25      And if you come in here saying that now the

84

```
 1    drugs belong to Williams, and if you represent --
 2    if Jointer goes to trial, I don't know how you
 3    will resolve that.  I'm going to leave that under
 4    the Canons of Professional Responsibility and all
 5    of that for you to resolve.  But it is a question
 6    that has to be resolved, and you'll resolve it.
 7         MR. BLEVINS:  I will --
 8         THE COURT:  No, no, no.  I'm not going to get
 9    into any details.  It is a pro- -- It is a
10    question in my mind how you can represent both of
11    these defendants, and put one against the other
12    one as to who the drugs belong to.
13         Now, you're a lawyer, you have to resolve
14    that.  And I'm going to leave it up to you to
15    resolve it.
16         MR. BLEVINS:  Judge, if I can just say on the
17    record here, because I've been attacked numerous
18    times here on ethical grounds.
19         THE COURT:  Well --
20         MR. BLEVINS:  I am aware of the rules of
21    conduct.  I have an obligation.  I'm complying the
22    rules.
23         THE COURT:  I believe you are aware of the
24    Rules of Ethical Conduct.  You -- In the opening
25    statement, you have told -- stated affirmatively
```

1    that these drugs belonged to Jointer.  Now, that's

2    what you have stated affirmatively.

3          MR. BLEVINS:  That's not evidence.

4          THE COURT:  That's fine.  And if Jointer

5    goes to trial, the prosecutor is going to be able

6    to take that statement, that record, and read to a

7    jury that you said that these drugs belonged to

8    Jointer.

9          MR. BLEVINS:  Judge, what I say is not

10    evidence.

11          THE COURT:  No, sir.

12          MR. BLEVINS:  I can say the sky is blue.

13          THE COURT:  No, no, but it's a representation

14    as a lawyer before the Court.  This is

15    something --

16          MR. BLEVINS:  Well --

17          THE COURT:  No.  Now, listen; you resolve it.

18    I'm not going to resolve it.

19          MR. BLEVINS:  Judge, if I -- If they can do

20    that, if another attorney was representing

21    Jointer, then supposedly the State could call me

22    as a witness to say I blamed it on Carlos

23    Williams.

24          THE COURT:  If another attorney was

25    representing Jointer, and hadn't made that

86

```
 1        statement in the record as an officer of the
 2        court, he can represent Jointer.  I don't care who
 3        Jointer hires to represent him.  Both of these
 4        parties can hire anybody they want to represent
 5        them.
 6             The problem is, I -- You resolve it.  If you
 7        feel you have resolved it ethically, then you
 8        resolve it.
 9             MR. BLEVINS:  I do.
10             MR. FOREMAN:  Judge, for the record also, I
11        would like once again, you know, I would ask for a
12        mistrial.
13             THE COURT:  No, no.  It's not going to be a
14        mistrial.  It's going to trial.
15             That's it.  Come back at 1:15.
16                 (The lunch recess was taken.)
17             THE COURT:  Call your next witness.
18             MR. DAVIDSON:  Detective Bartlett.
19             THE COURT:  Detective Bartlett.
20                     BRAD BARTLETT,
21        the witness, after having first been duly sworn to
22        speak the truth, the whole truth, and nothing but the
23        truth, testified as follows:
24                   DIRECT EXAMINATION
25        BY MR. DAVIDSON:
```

87

```
 1    Q.   State your name.

 2    A.   Brad Bartlett.

 3    Q.   How you are you employed?

 4    A.   Montgomery Police Department in fact.

 5    Q.   How long have you been employed there?

 6    A.   About 8 years.

 7    Q.   Now, did you have occasion to be involved in a

 8    case against Carlos Williams?

 9    A.   I did.

10    Q.   And how did that come about?

11    A.   We had set up a undercover reverse drug deal.  We

12    were posing as drug dealers, and we were going to sell

13    a guy by the name of Cleve, a kilo for $20,000.

14    Q.   And at what point did you come in contact with Mr.

15    Williams?

16    A.   He showed up with a black male, Cleveland Jointer.

17    They followed him in -- excuse me -- he was driving

18    the vehicle.  He was with another subject, Xavier

19    Jointer.  And they followed Cleveland Jointer to the

20    hotel.

21    Q.   Now, let me back up one second.  Did you have

22    occasion to do -- to see the vehicle that he was in at

23    any point prior to that vehicle driving into the

24    hotel?

25              MR. BLEVINS:  Objection; relevance.
```

88

```
 1              THE COURT:  Overruled.
 2    A.   Yes, sir.
 3    Q.   And when was that?
 4    A.   Probably five minutes before they showed up at the
 5    hotel.
 6    Q.   What did you see?
 7    A.   The --
 8              MR. BLEVINS:  Judge, can I have a continuing
 9         objection to relevance for this line of
10         questioning?
11              THE COURT:  You may have a continuing
12         objection.  Overruled.
13    A.   The vehicle that Mr. Williams was driving met with
14    the vehicle that Cleveland Jointer was driving at the
15    gas station of Carmichael and the Boulevard.
16    Q.   Now, what did they do that you saw after they were
17    together at the gas station?
18    A.   They left the gas station and came to the hotel
19    room.  They followed each other.
20    Q.   Now, did you see any of these individuals get out
21    of their cars at the gas station?
22    A.   No.
23    Q.   Now, once they were back at the hotel, what was
24    it, if anything, you observed that happened involving
25    the defendant, Carlos Williams?
```

89

```
 1   A.   The only thing I saw then was he followed the
 2   vehicle that Cleveland Jointer of driving.  Once they
 3   came in the hotel, I lost sight of them because they
 4   went around the rear of the hotel.
 5   Q.   Beyond surveillance, did you have any other
 6   function during this operation?
 7   A.   Yes.  I mean, I was the -- originally the case
 8   agent.
 9   Q.   Now, did you observe any of the actions that took
10   place at the cars involving the other officers out
11   there?
12   A.   No, sir, I did not.
13   Q.   Did -- At some point did one of the officers
14   deliver to your possession any substance found at the
15   scene?
16   A.   Yes.
17        MR. DAVIDSON:  May I approach the witness,
18        Your Honor?
19        THE COURT:  You may approach the witness.
20   Q.   I want to show you what's been marked as State's
21   Exhibit -- for identification purposes, that's Exhibit
22   1.  Do you recognize this?
23   A.   I do.
24   Q.   And what is that?
25   A.   This is an envelope which contains the drug
```

90

1    evidence that was turned over to me that day.

2    Q.    How do you know it's the same envelope?

3    A.    Because it's sealed, and got my initials on it.

4    Q.    All right.  Is there anything in the envelope?

5    A.    Yes, there's crack cocaine in the envelope.

6    Q.    It may already be opened.  Can you --

7         MR. BLEVINS:  Judge, I'm going to object.

8         Unless the witness is a qualified forensic

9         scientist, move to strike his answer.

10        THE COURT:  Overruled.

11   Q.    And do you recognize what you just pulled out of

12   the envelope?

13   A.    Yes, I do.

14   Q.    And what is that?

15   A.    It's the drug evidence I submitted to the

16   Department of Forensic Sciences.

17   Q.    Now, do you have a Forensic Sciences number on any

18   of that that corresponds to the documents they have?

19   A.    I do.

20   Q.    And what's the number on the package?

21   A.    05MG02463.

22        MR. DAVIDSON:  Judge, we would move to admit

23        Exhibit Number 1 into evidence.

24        MR. BLEVINS:  Objection; lack of proper

25        predicate.

91

```
 1              THE COURT:  Admitted.  Overruled; admitted.
 2                    (State's Exhibit Number 1 was admitted
 3                    into evidence.)
 4    Q.   Let me show you what's been marked as State's
 5    Exhibit 2 for identification purposes, and ask if
 6    you -- if you recognize this?
 7    A.   I do.
 8    Q.   And what is that?
 9    A.   This is the receipt we get back from DFS.  It
10    gives us the results of the evidence that we
11    submitted.
12    Q.   Now, is there a number on that form?
13    A.   There is.
14    Q.   And what's that number?
15    A.   05MG02463.
16    Q.   The same number that was on the drugs you
17    submitted?
18    A.   Correct.
19         MR. DAVIDSON:  Judge, we would move to offer
20         Exhibit 2 into evidence.
21         MR. BLEVINS:  Objection; lack of proper
22         predicate and conformity with statutory
23         requirements.
24         THE COURT:  Overruled.  Admitted.
25              (State's Exhibit Number 2 was admitted
```

92

1             into evidence.)

2  Q.   Did that document evidence a result of testing on

3  those drugs you submitted?

4  A.   It does.

5  Q.   And what was the result?

6         MR. BLEVINS:   Judge, if I could have a

7      continuing objection on all the testimony based

8      upon this document.

9         THE COURT:   You have a continuing objection.

10      Overruled.

11  A.   The Results of Analysis reads, "Laboratory

12  analysis of the solid material revealed the presence

13  of cocaine base, a controlled substance.   One --

14  Weight in grams, 1.12 grams.

15         MR. DAVIDSON:   No further questions, Your

16      Honor.

17         THE COURT:   All right.   Cross-examination.

18                  CROSS-EXAMINATION

19  BY MR. BLEVINS:

20  Q.   Detective Bartlett, is there a distinction of

21  being called a case agent?   Is there a difference in

22  just an ordinary officer involved in the case?

23  A.   More stress.

24  Q.   Okay.   Are you, like, the case agent, the officer

25  who has primary responsibility for the case itself?

93

```
 1   A.   Correct.

 2   Q.   Okay.  Now, would you tell the jury what day

 3   Cleveland Jointer was arrested?

 4   A.   He has not been arrested.

 5   Q.   Cleveland Jointer was the person y'all was set up

 6   to buy a kilo of cocaine on July 20, '05, correct?

 7   A.   Correct.

 8   Q.   And y'all have known his identity since July 20th

 9   of '05; is that correct?

10   A.   Correct.

11   Q.   And there's been -- Cleveland Jointer has not been

12   arrested for anything through this date; is that

13   right?

14   A.   That is correct.

15   Q.   Would you tell the jury why not?

16   A.   That's an ongoing federal investigation we haven't

17   closed out yet.

18   Q.   Okay.  Cleveland Jointer fled from the scene; did

19   you witness that?

20   A.   Yes.

21   Q.   Were you present when $20,000 -- roughly $20,000

22   was found in a bag in the woods not far from the motel

23   we've been talking about?

24   A.   When you say not far...

25   Q.   Well, there was $20,000 found in a bag after
```

1  Cleveland Jointer fled the scene, correct?

2  A.   Yes.

3  Q.   All right.  All right.  This roadway that you say

4  Mr. Williams followed Cleveland Jointer in on, that's

5  a roadway the public is supposed to use, correct?

6  It's not like a side road or something?

7  A.   It's is the entrance to the hotel.

8  Q.   All right.  When you saw this Mazda that Cleveland

9  Jointer was driving, were there other cars also on

10  that roadway other than Mr. Williams' car?

11  A.   At the time we entered the hotel?

12  Q.   Yes.

13  A.   No, sir.

14  Q.   So it was just the two cars, the Mazda and the

15  Honda?

16  A.   Correct.

17  Q.   All right.  And you testified that you had as part

18  of your surveillance, seen the Honda with the Mazda;

19  do you recall that?

20  A.   Yes, sir.

21  Q.   Was that before Cleveland Jointer first arrived at

22  the motel or after he arrived there and then left?

23  A.   After we -- We picked up surveillance on Cleveland

24  the first time he came to the hotel.

25  Q.   All right.  So Cleveland came there for a drug

95

```
 1    deal, and then Cleveland left.  And that's when you
 2    observed the Mazda go to where the Honda was?
 3    A.   That's right.
 4    Q.   All right.  Were y'all making video surveillance?
 5    A.   No, we did not.
 6    Q.   You didn't make any recordings?
 7    A.   No, we did not.
 8    Q.   All right.  And you physically left the motel and
 9    went to where the Mazda went, correct?
10    A.   Correct.
11    Q.   Is that true?
12    A.   Correct.
13    Q.   All right.  And who did you see in the Honda, if
14    anyone?
15    A.   Two black males.  I didn't know who they were.
16    Q.   So you can't say that Carlos Williams was in the
17    Honda when you saw the two cars together, can you?
18    A.   No.
19    Q.   All right.  Can you identify Xavier Jointer as
20    having been in the Honda when you saw it?
21    A.   No.
22    Q.   Can you even say there were two people in the
23    Honda?
24    A.   Yes, sir.
25    Q.   Now, who was in Cleveland Jointer's car when saw
```

96

```
 1   them?
 2   A.   A black male.
 3   Q.   Was anybody else in Cleveland Jointer's car?
 4   A.   No.  No, sir.
 5   Q.   And I believe you testified earlier you didn't see
 6   anybody from the Honda vehicle give anything to the
 7   person in the Mazda, right?
 8   A.   No.
 9   Q.   You didn't see anything?
10   A.   Just that they -- you know, that they met at the
11   gas station.
12   Q.   Okay.
13   A.   We didn't have a constant eyeball of the -- We
14   just saw that they were there together at the gas
15   station.
16   Q.   And is Cleveland Jointer the brother of Xavier
17   Jointer?
18   A.   I believe so.
19   Q.   Well, as the case agent in charge of this overall
20   case investigation, have you determined whether
21   Cleveland Jointer is the brother of Xavier Jointer?
22   A.   Well, nobody said that they're brothers, but they
23   had the same address and last name, and they look
24   alike.  So I'm assuming they're brothers.
25   Q.   Okay.  Now, this Honda that came to the motel, you
```

1    did run a check to determine the registration on that
2    vehicle, did you not?
3    A.    Yes.    I believe it came back to a Richard
4    Williams.
5    Q.    All right.    You ran a check, and the vehicle did
6    not come back to Carlos Williams, did it?
7    A.    You're referring to the vehicle that he was
8    driving?
9    Q.    The Honda that Mr. Williams was apprehended in,
10   was not registered in Mr. Williams' name, was it?
11   A.    No.
12   Q.    Okay.    And, in fact, would you tell the jury the
13   total amount of time that you saw Carlos Williams in
14   the Honda on July 20th of '95?    Less than 15 minutes?
15   A.    Yeah, probably.
16   Q.    Okay.    Were you present at the scene when Carlos
17   Williams was removed from the Honda?
18   A.    I was not.
19   Q.    So you didn't see him removed?
20   A.    No.
21   Q.    All right.    Were you present at the scene when
22   Carlos Williams was searched?
23   A.    No, sir.
24   Q.    Okay.    Were you present to observe Cleveland
25   Jointer flee the scene?

98

```
 1   A.   Not from the rear of the residence.  I was at the
 2   front of the hotel, and I saw them leave the front of
 3   the hotel.
 4   Q.   Where exactly did you go after you did
 5   surveillance and saw the Mazda and the Honda near one
 6   another?  Did you follow those two cars back into the
 7   motel, or did you return to the motel before they got
 8   there, or how did that happen?
 9   A.   We -- like I say, there were several undercover
10   officers out there.  I didn't want to get my vehicle
11   burned, so we came back to the entrance and sat up on
12   the entrance of the hotel.  And the other officers
13   watched the defendant.
14   Q.   All right.  So after you saw the Honda and Mazda
15   together, you left that point wherever you were, went
16   back to the motel and waited on the vehicle?
17   A.   Yes.
18   Q.   And I take it you were waiting on the Mazda to
19   come back for Cleveland Jointer to have the $20,000
20   for the drug buy, correct?
21   A.   Correct.
22   Q.   All right.  Detective, do you know who this
23   cocaine belonged to, that's been marked as State's
24   Exhibit 1?  Do you have any personal knowledge as to
25   who owned that cocaine?
```

```
 1    A.    I know who was in constructive possession of it.

 2    Q.    Right.  Xavier Jointer, right?

 3    A.    They were both -- Yes, and your client.

 4    Q.    Now, you arrested Xavier Jointer, didn't you?

 5    A.    We did.

 6    Q.    For possession of cocaine, correct?

 7    A.    Correct.

 8    Q.    The cocaine that's identified as Exhibit 1,

 9    correct?

10    A.    Correct.

11    Q.    Why did you arrest Xavier Jointer?

12    A.    Because he was in possession of the cocaine.

13    Q.    All right.

14    A.    As was your client.

15    Q.    You saw the cocaine on Mr. Williams, did you?

16    A.    No.

17    Q.    So when you say he was in possession of it, you

18    mean it was in the car when he was driving; is that

19    right?

20    A.    Correct.

21    Q.    Okay.

22          THE COURT:  All right.  Any further

23    questions?

24    Q.    Did you submit the plastic bag the cocaine was in

25    for fingerprint analysis?
```

1   A.   No, sir.

2   Q.   Why not?

3   A.   I didn't feel the need to.

4   Q.   Well, if there were fingerprints on there

5   belonging to Xavier Jointer, it would sort of

6   implicate him as having touched the bag, wouldn't it?

7   A.   It would.  But this bag, you wouldn't have gotten

8   any prints off this bag.

9   Q.   Okay.  All right.  Give me just a second.  This

10  Honda that you saw, was it a blue Honda, the one Mr.

11  Williams was in?

12  A.   I think it was a black Honda.

13  Q.   Let me show you a couple of pictures.  Let me

14  first show you Defendant's Exhibit 2.  Can you tell me

15  if you recognize what's in that photograph?

16  A.   Black Honda Accord, four-door.

17  Q.   Is that the -- Does that appear to be the Honda

18  Accord that you saw Mr. Williams in on July 20th of

19  '05?

20  A.   I mean, it could be.

21        MR. BLEVINS:  I move to admit Exhibit 2.

22        MR. DAVIDSON:  Objection, Your Honor.  The

23     witness has said that it could be.  There's no

24     foundation -- There's no foundation that he

25     recognized that this picture depicts the vehicle

1    in question.

2         THE COURT:  All right.  Ask him more

3    questions about it, Mr. Blevins.  You'll have to

4    lay the proper predicate.

5         MR. BLEVINS:  Yes, sir.

6    Q.  (By Mr. Blevins)  Detective, y'all actually --

7    y'all being the police -- actually impounded this car,

8    the Honda, correct?

9    A.  Yes, we did.

10   Q.  Meaning the police took it from the scene and

11   towed it to a city government lot, correct?

12   A.  It wasn't a city government lot.  It was B&R

13   Wrecker, I think.

14   Q.  And as the case agent, did you do an inventory on

15   the car after it was impounded?

16   A.  No, Detective Wright did.

17   Q.  Did you ever see the car after it was impounded?

18   A.  No, sir.

19   Q.  Okay.  Can you tell me whether that is a picture

20   of the car?

21   A.  I can tell you that this is a Honda Accord.

22   Q.  All right.  And do you recognize that as the car

23   he was operating on that date?

24   A.  There are thousands of Honda Accords.  I mean, I

25   could -- there's no VIN number on here; no tag number.

1   Q.   All right.

2         THE COURT:  All right.  Any further

3   questions?

4   Q.   Did y'all take pictures of the car?

5   A.   No, sir.

6   Q.   All right.  Let me show you Exhibit 1.  And my

7   question to you is, do you recognize that as the

8   interior of the Honda Accord that Mr. Williams was

9   removed from?

10  A.   No, sir.  I can't tell you that.

11        All right.

12        MR. BLEVINS:  Judge, if I could look at my

13   notes for one second.

14        THE COURT:  All right.  You may do it.

15        MR. BLEVINS:  That will do it.  Thank you.

16        THE COURT:  All right.  Any further

17   questions?

18                REDIRECT EXAMINATION

19  BY MR. DAVIDSON:

20  Q.   Detective, in response to one question you were

21  just asked, I think you stated that you were waiting

22  for the Mazda to come back to the hotel with the

23  $20,000 for the purchase of drugs?

24  A.   Correct.

25  Q.   And that was because when the driver of that Mazda

103

1    left, he didn't have $20,000, correct?

2    A.    Correct.

3    Q.    But when he came back, he did have close to

4    $20,000?

5    A.    Correct.

6    Q.    And to your knowledge, there's no individuals he

7    was with from the time you left to the time you came

8    back other than his car being -- meeting up with the

9    defendant's car?

10   A.    That's correct.

11   Q.    And then as far as -- I believe you started to

12   answer who the registration on the defendant's car

13   came back to.  Can you state again the name?

14   A.    Richard --

15        MR. BLEVINS:  Objection; Best Evidence Rule.

16        THE COURT:  Overruled.

17   A.    Richard Williams.

18        MR. DAVIDSON:  No further questions.

19        THE COURT:  All right.  Step down.

20        MR. BLEVINS:  Judge, if I could just ask him

21   a few --

22        THE COURT:  Okay.

23                 RECROSS-EXAMINATION

24   BY MR. BLEVINS:

25   Q.    Detective, when Mr. Williams' Honda came to the

104

```
 1   motel, did you observe Mr. Williams break any laws

 2   driving down that roadway?

 3   A.   No.

 4   Q.   Did you see him even commit a traffic violation?

 5   A.   No, sir.

 6   Q.   Did you see him doing anything that made it appear

 7   he was about to commit a crime?

 8   A.   Yes, sir.

 9   Q.   You saw him doing something driving down the road

10   as though he was going to commit a crime?

11   A.   He was following our target into the residence to

12   make a drug deal.

13   Q.   Okay.  Well, you didn't -- Y'all didn't find any

14   money on Mr. Williams, did you?

15   A.   No, just crack.

16   Q.   You found -- So now you found crack on Mr.

17   Williams.

18   A.   In the vehicle, yes, sir.

19   Q.   Okay.  Are you here to sort of slant your

20   testimony to try to get this jury to convict Mr.

21   Williams?

22        MR. DAVIDSON:  Objection, Your Honor.

23        THE COURT:  Listen, Mr. Blanchard -- Mr.

24   Blevins, you know that's an improper statement.

25   I'll sustain the objection.
```

105

```
 1              The questions are not coming -- you're asking
 2         him the questions.  Now, the witness is simply
 3         answering the questions.
 4              I'll sustain that, now.
 5    Q.   Okay.  Let me just ask you one final question, so
 6    we're not confused.  You didn't find any drugs on Mr.
 7    Williams, did you?
 8    A.   Personally, no.
 9    Q.   Nobody did, did they?
10    A.   Yes.  Not on his person, but in the vehicle he was
11    driving.
12    Q.   Thank you, sir.
13              THE COURT:  All right.  Can this witness be
14         excused?
15              MR. DAVIDSON:  Yes, Your Honor.
16              THE COURT:  Step down.  You're excused.
17         Call your next witness.
18              (The witness stepped down.)
19              MR. FOREMAN:  Your Honor, the State rests.
20              THE COURT:  The State rests.
21              Ladies and gentlemen, that means the State
22         has presented all the evidence they're going to
23         present in its case in chief.  Since we just
24         returned from lunch, I have to take up some
25         matters with the lawyers out here.  I'm going to
```

1    ask you to step into the jury room. I'll bring

2    you out in a few minutes. Nobody get lost, now.

3                (The jury was placed in recess, after

4                which the following proceedings were

5                held, outside of their presence:)

6        THE COURT: Any jury charges other than the

7    standard jury charges?

8        MR. BLEVINS: Judge, since the State has

9    rested --

10       THE COURT: I'm going to make your motion.

11   Wait a minute. Well, make your motion first.

12       MR. BLEVINS: We would move for a judgment of

13   acquittal. I'm reading from this case of

14   *Stanberry v. State* in the Court of Criminal

15   Appeals, December 2000. And instead of me saying

16   what it says, I'll just read what the Court of

17   Appeal said:

18       "In order to establish constructive" --

19       THE COURT: Not so loud. Not so loud.

20       MR. BLEVINS: Oh.

21       THE COURT: Go ahead.

22       MR. BLEVINS: "In order to establish

23   constructive possession, the State must prove the

24   following: (1) Actual or potential physical

25   control; (2) intention to exercise dominion; and

1   (3) external manifestations of intent and

2   control."

3       The Court of Criminal Appeals noted that the

4   court has set out several circumstances that could

5   connect a defendant with contraband and establish

6   constructive possession.  Those circumstances

7   include evidence that the defendant had

8   substantial control over the particular place

9   where the contraband was found.  The defendant's

10  admissions, including conduct that demonstrated a

11  consciousness of guilt; and evidence that the

12  degree of the contraband was found on the

13  defendant's person.

14      The Court of Criminal Appeals has also held

15  that where a defendant is in nonexclusive

16  possession of an automobile, neither his presence

17  in the automobile nor his close proximity to the

18  controlled substance is sufficient in itself or

19  when taken together, to establish the knowledge

20  element necessary to support a finding of

21  constructive possession.

22      The evidence in this case is simply that Mr.

23  Williams was found in a vehicle where there was

24  crack cocaine also found.

25      THE COURT:  I'm familiar with both of those

108

1    cases, and I disagree with the analysis of the

2    facts in this case and what those two cases stand

3    for.  So the motion to dismiss is hereby denied.

4         What says the State?  Any jury charges?  Any

5    jury charges other than the standard charges?

6         MR. BLEVINS:  Judge, can I also -- I made an

7    objection earlier.  I also move for a judgment of

8    acquittal on the basis that the forensic analysis

9    document -- let me refer to it by exhibit

10   number -- one or the other one says the State must

11   prove that the substance is a controlled

12   substance.

13        State's Exhibit 2 is devoid of the

14   notarization or signature required on this

15   document to authenticate the substance.

16        THE COURT:  Okay.  Motion denied.

17        Any charge of constructive possession?  Any

18   charges?

19        MR. FOREMAN:  Probably -- Just give us the

20   standard one.

21        THE COURT:  All right.  15 minutes a side.

22   That's enough time.

23        Y'all ready?  Do you have any witnesses?

24        MR. BLEVINS:  No, sir.  Defense would rest.

25   If I could renew my motion for judgment of

109

```
 1      acquittal --
 2           THE COURT:  Motion denied.
 3           MR. BLEVINS:  -- on the same grounds
 4      previously argued.
 5           THE COURT:  Motion denied.
 6           All right.  Turner, what are we doing?
 7                (There was a brief interruption of the
 8                proceedings while the Court discussed
 9                another case.)
10           All right.  You've got 15 minutes a side,
11      then I'll charge the jury.
12                (The jury was placed in the box, after
13                which the following proceedings were held
14                in their presence:)
15           THE COURT:  All right.  Is the state ready?
16           MR. DAVIDSON:  Yes, Your Honor.
17           THE COURT:  It's time for closing argument.
18      You have you 15 minutes a side.  The State goes
19      first.
20           MR. DAVIDSON:  Thank you.
21                     CLOSING ARGUMENT
22      BY MR. DAVIDSON:
23           Ladies and gentlemen, I just want to spend a
24      few minutes focusing on some of the law that I
25      want you to focus on in this case.  Judge Price
```

1     will give you all the law you need to know.

2     There's just a few things I want to focus on

3     briefly.

4          First, as you've already heard, there are two

5     types of possession.  There's actual possession

6     and constructive possession.

7          Actual possession would be me holding this

8     pen right here.  I am actually possessing this

9     pen.

10         Constructive possession would be if I laid it

11    right here.  I'm still in constructive possession.

12    It's within my reach; something I can take

13    possession of.  And that's what we have here.

14         MR. BLEVINS:  Judge, I'm going to object.

15    That misstates the law.

16         THE COURT:  Well, he -- This is just

17    argument, Mr. Blanchard (sic).  Now, he's not

18    stating the law.  I'm going to state the law.

19    Okay?  This is simply argument.  I'll tell the

20    jury what Mr. Davidson says is argument; what you

21    say is argument.  Okay?

22         Overruled.  Go ahead.

23         MR. DAVIDSON:  In this case we have cocaine

24    right there.  And you've heard a lot of testimony.

25    Everybody is consistent with where it was; opening

1   right there in the front of the car.  Right there,

2   close to the driver; sitting right there in plain

3   view.

4       The car.  The defendant is driving.  There's

5   constructive possession in this case.  And I

6   believe the evidence has been clear the defendant

7   possessed that cocaine.

8       Now, there's also talk about this other

9   person in the car; the fact that he was charged,

10  and that he might have some type of hearing coming

11  up on this same substance.  Now, I ask that you

12  not go back there and get into an argument over

13  who possessed it more.  The question is, did the

14  defendant, based on the law you're going to hear,

15  possess these drugs?

16      In the state of Alabama, it's possible for

17  more than one person to possess a substance.

18  While sitting down next to Mr. Foreman, if we have

19  drugs right there between us, then it's possible

20  that we could both be found guilty of possessing

21  the drugs.  Just because somebody else was

22  involved might also have known the drugs were

23  right here, and might also have been

24  constructively possessing the drugs, doesn't mean

25  Mr. Williams gets a free pass.

112

1    Look at the evidence.  Remember the testimony

2    today, and determine whether Mr. Williams

3    constructively possessed these drugs.

4    The defendant is given -- In the state of

5    Alabama we have to prove the defendant -- the case

6    against the defendant beyond a reasonable doubt.

7    The judge will give you some explanation of what

8    that means.  But it's not beyond all doubt.  It's

9    not, as you heard earlier, questions about

10   conceivable, inconceivable.  The standard is not

11   whether you can conceive of some other -- some

12   reason not to find the defendant guilty.

13   The question is, do you have a doubt for

14   which there is a reason for; not that you're

15   supposed to go back there and spend all day

16   searching for a reasonable doubt.  Is there a

17   reasonable doubt that springs from the evidence

18   before you today?

19   I suggest there is not.  There's been no

20   reasonable doubt put forth.  The testimony has

21   been clear.  The evidence has been clear.  The

22   defendant knew the drugs were there.  The

23   defendant intended to possess those drugs right

24   there next to him.  The defendant possessed this

25   cocaine.

113

1       Ladies and gentlemen, I ask you to just use

2   your common sense.  You've heard the testimony.

3   You've heard why the officers were there; that the

4   person they were surveilling left; met up with the

5   defendant and another person in the car at the gas

6   station; they came back.

7       The other person had more money than he had

8   before to purchase these drugs.  The defendant had

9   drugs right there in plain view in his car.  The

10  other person -- you know, there was a suggestion

11  during the opening statement of Mr. Blevins that

12  they just somehow came forth from the other

13  person, and ended up in plain view right there

14  next to the defendant.

15      I ask you to just use your common sense.

16  Recall the testimony that -- There's no movement

17  from the other passenger with his arm going toward

18  that area.  His hands stayed by him.  They

19  couldn't see his hands because they were below

20  him.  The special agent had a clear view; never

21  saw his hand going over to that area.  The drugs

22  did not spring forth from his hands, and unluckily

23  for Mr. Williams, end up in that compartment in

24  plain view.  Use your common sense.

25      Recall the testimony and the evidence today,

114

```
 1        and find the defendant, Carlos Williams, guilty of

 2        possessing cocaine.

 3              THE COURT:  You have eight minutes left.

 4              You have 15 minutes, Mr. Blevins.

 5              MR. BLEVINS:  Does that start when I get the

 6        podium up there?

 7              THE COURT:  It starts when you leave the

 8        table.

 9                        CLOSING ARGUMENT

10   BY MR. BLEVINS:

11              Good afternoon, ladies and gentlemen.  I told

12        you in opening statements there were going to be

13        some undisputed facts, and I hope -- 1 think we've

14        proved the undisputed facts.

15              The charge in this case is possessing this

16        thing here; something so small you can't hardly

17        see it from the short distance away.

18              Possession.  It's not -- It wasn't on

19        anybody.  So what you've got to decide is, did the

20        State prove certain things with respect to Mr.

21        Williams.

22              The judge is going to charge you on the law.

23        They have to prove three things:  One is actual or

24        physical -- actual or potential physical control;

25        (1).
```

115

```
 1              (2) They must prove Mr. Williams had the
 2       intention to exercise the dominion over this; and
 3       third, the reason their case fails, they must
 4       prove external manifestations of intent and
 5       control by Mr. Williams.  They didn't prove it.
 6       They can't prove.  They lose.
 7              What does the third thing mean?  External
 8       manifestations of intent and control.  It means
 9       such things as police officers come up and give
10       you a command, "Put your hands -- put your hands
11       up."
12              You're fiddling around down below the seats.
13       The police say, "Get your hands up."  You're
14       fiddling around.
15              "Get your hands up."  You put your hands up.
16       That is indicative of guilt.  That is external
17       manifestations of intent to control; being fishy,
18       acting funny.  Who did that?  Xavier Jointer.
19              Why was Xavier Jointer fiddling around in the
20       car when the police were telling him to get his
21       hands up?  Because he has the crack on him.
22              How did the crack get on the console?  Who
23       knows?  Maybe Xavier was fiddling around in the
24       car and he just threw it up there.  Maybe he took
25       it and set it up there.  Who knows?
```

116

1    Did they prove one single thing that Mr.

2  Williams did that you could say, "Sounds like he

3  put that crack up there"?  Not one single act.

4  Mr. Williams was cooperative.  He did what they

5  told him.  He got out of the car.  He didn't try

6  and run.  He didn't anything.

7    Xavier Jointer, on the other hand, is there

8  within arm's reach of the cocaine.  Xavier

9  Jointer's brother is there buying a kilo of

10  cocaine for $20,000.  Who do you believe the

11  cocaine most likely belonged to, Xavier Jointer or

12  Carlos Williams?

13    The State didn't produce one piece of

14  evidence that Mr. Williams has ever been in

15  trouble before; he's ever been convicted of

16  anything.

17    MR. FOREMAN:  Objection, Your Honor.

18    THE COURT:  I'll sustain that objection.

19    MR. FOREMAN:  I mean, if he's going to that

20  door, then --

21    THE COURT:  I sustained the objection, Mr.

22  Blevins.

23    MR. BLEVINS:  Let's look at the facts.  The

24  vehicle, the Honda, which no officer could even

25  identify, was not owned by Mr. Williams.  The

Denise L. Gordon
Official Court Reporter
(334) 832-1330

117

1    officer said, Mr. Williams wasn't in possession of

2    any drugs; wasn't on him anywhere.

3        No fingerprints on the bag.  They could

4    have -- the officer said, "We could have submitted

5    it for fingerprint testing."  Who knows?  Xavier

6    Jointer's thumbprint may be right there on that

7    bag.

8        What the police did, they found crack in the

9    car with two people; they just arrested everybody.

10   They charged Xavier with it.  They charged Carlos

11   Williams with it.  They don't know.

12       The officer sat there, and I said, "Do you

13   know who the drugs belonged to?"  The officer

14   said, "no."  It could have belonged to Xavier;

15   could have belonged to Carlos.

16       I'll tell you this:  If the State of Alabama

17   wants you to convict somebody, and an officer who

18   was there on the scene comes in here and says, "I

19   can't tell you it's Carlos Williams' drugs," how

20   in the world are you supposed to know?

21       The burden is on them.  And I suggest to you

22   when you took your oath as a juror, you said, "I'm

23   going to look at the evidence, and if it says he's

24   guilty, I'm going to convict him.  But if the

25   State has failed to meet their burden of proof,

118

1      I'm going to say not guilty."

2          Now, you can easily go in there and say he

3      was at a location where there were drugs. Let's

4      just convict him. But that's not upholding your

5      oath. You took an oath to look at the evidence,

6      and decide if a citizen of this county that's a

7      neighbor that you may have the passed on the

8      street is guilty or not. You have to do that.

9      You have to uphold your oath.

10         Did the State meet their burden of proof? Is

11     there reasonable doubt? When you go in the jury

12     room and you consider everything you've heard, do

13     you say, "I have a doubt as to whether or not it

14     was his"?

15         "I don't think I can comfortably, with a

16     clear conscience say they proved it." That's the

17     burden here, proof beyond a reasonable doubt.

18         In the end, the State has come in here and

19     presented evidence about a big drug transaction

20     that really has no bearing on the charge itself.

21     You'll recall Carlos Williams wasn't found with

22     money; $10,000, $20,000. He wasn't found to have

23     been involved in this drug transaction that went

24     on over here, separate from the possession case.

25     He wasn't linked to that in any way. This case is

119

1    not about a one kilo, $20,000 drug buy.  This case

2    is about this and this alone.

3         Do we know how long Carlos Williams was even

4    in the car before he was caught with this in the

5    car?  The only testimony we have is about 15

6    minutes.  That's it.

7         Was the cocaine left in there by the person

8    who drove the car before Carlos Williams?  Who

9    knows?

10        But in closing, I suggest to you there's more

11   than reasonable doubt.  There's a total lack of

12   evidence.  And I suggest to you when you apply the

13   standard of proof beyond a reasonable doubt, the

14   State's burden of proof, you just cannot convict

15   Mr. Williams.  Because if you can, if I put that

16   right there, they're both guilty of possessing

17   cocaine because right there, it was within arm's

18   reach of them.  And that's not the burden of

19   proof.  If he's guilty, they're guilty of that

20   crack cocaine right there.

21        I would ask after your deliberations you come

22   back with the only appropriate verdict in this

23   case; and that would be a not guilty verdict.

24        Thank you.

25        THE COURT:  All right.  You have 8 minutes

120

1    left, Mr. Foreman.

2                REBUTTAL CLOSING ARGUMENT

3    BY MR. FOREMAN:

4        What Mr. Blevins has just told you is not

5    entirely accurate.  He wants you to believe that

6    you have to have cocaine in your hand or in your

7    pocket to be found guilty of possession of

8    cocaine.  It's not ownership of the cocaine, like

9    we said; you don't have to own it.  You have to be

10   in possession of it.  And you can do that without

11   having it in your hand or without having it in

12   your pocket.

13       Look at the circumstances of this case.  Look

14   at what went down.  That's how you figure out

15   whether or not he had intent to possess it.  You

16   look at what happened.

17       What happened is, there's a big drug buy

18   going down, to start with; big drug buy.  There

19   were several, actually.  Cleveland Jointer doesn't

20   have the money.  He's only got 10,000.  So he says

21   that he needs to go get the money from Mr.

22   Williams.

23       MPD surveillance, what the evidence is, that

24   they have witnessed him go to the gas station

25   around the corner, and who was there?  Carlos

121

1    Williams and Xavier Jointer; met with them.

2        MR. BLEVINS:  Judge, I'm going to object.

3    That misstates the evidence.

4        THE COURT:  The jury will remember what the

5    evidence is.  He's just arguing.

6        MR. FOREMAN:  The car comes back; they follow

7    each other in.  They park by each other.  What

8    were they doing there?  Is it just kind of a

9    coincidence that they came back?

10       Did Cleveland Jointer just happen to have

11    $20,000 at that point?  Look at the circumstances

12    of this case, and look at what is on.  And listen

13    to the evidence, because that is that your job.

14    That is what you guys are here for, to listen to

15    the evidence.

16       And what the evidence is, is not what I'm

17    telling you.  It's not what Kevin Davidson is

18    telling you.  It's not what Jerry Blevins is

19    telling you.

20       What the evidence is, it's what has been

21    admitted, and what came from this stand right

22    here.  That is what the evidence is.

23       The only evidence that you heard is that when

24    they approached that car -- and they approached it

25    as soon as they pulled into this spot -- pulled

122

1    into the parking spot that Neil Thompson from the
2    DEA had his eyes on Xavier Jointer in the
3    passenger seat. At no time did he see Xavier
4    Jointer put his hands up on the console; put the
5    drugs up there like Mr. Blevins was alluding to;
6    because it didn't happen. There's no evidence of
7    that. That is just Mr. Blevins trying to cloud
8    you as to what really happened.
9        The evidence is that car was driven by Carlos
10   Williams. He was in control of that car. And
11   also the car came back registered to Richard
12   Williams; the same last name. Mr. Blevins didn't
13   want Detective Bartlett to tell you that. He kind
14   of cut him off; because it's the same last name.
15       Mr. Williams was in control of that car. And
16   when you're in control of the car and there's
17   crack cocaine sitting this far away from you in
18   plain few, you will have -- you had to know and
19   exercise control over that right then and there.
20   Crack cocaine is this far away from you in the car
21   that you're responsible for and you're driving,
22   you're in control of, it's your cocaine.
23       MR. BLEVINS: Judge, again, I'm going to
24   object. He misstates the law.
25       THE COURT: It's just argument.

123

1    Go ahead.

2    MR. FOREMAN:  What you've got to do here is

3    use your common sense.  That is your best weapon

4    in a case like this.  Use your common sense.  Is

5    your common sense going to tell you that he didn't

6    know those drugs were there?  That he's driving a

7    car and he's got drugs just a foot or  so from him

8    and he has no idea they're there?  Use your common

9    sense, please.

10    And that is -- It's just a simple case.  It's

11    a simple case.  I mean, he's trying to make it

12    complicated.  He's trying to cloud the issue, but

13    it's a simple case.  There was drugs sitting right

14    here.  He's trying to say that he had no idea they

15    were there, and he couldn't have been able to

16    possess them.

17    If you look at the evidence, which is what

18    all these officers testified to, the only evidence

19    you have is that those drugs were in his view and

20    control.  He could have exercised control over

21    those drugs.  They were right here; right here.

22    I ask you to use your common sense.  Go back

23    and vote and find him guilty of possessing a

24    controlled substance.  And you don't have to --

25    There's been talk recently -- and the judge will

124

1    instruct that -- it's not just, "Hey, let me find

2    a doubt." It has to be a doubt for which a reason

3    can be given. It's not all doubt. We don't have

4    to prove it beyond all doubt. It's a reasonable

5    doubt. That's the standard.

6       And I ask you to listen to the judge when he

7    instructs you on that. Because it's not just a

8    doubt. It has to be a doubt for which a reason

9    can be given; a reasonable doubt.

10      I think if you listen and you think about

11   what was said on this stand, which is the only

12   evidence you have -- this is the evidence you have

13   for that. And you think about what was said when

14   these drugs were located, who was in control of

15   that car, the circumstances of what was going on,

16   you'll find Carlos Williams guilty.

17      Thank you.

18      THE COURT: All right.

19      Ladies and gentlemen, you've heard all the

20   argument you're going to hear in this case. It's

21   now time for me to charge you on the law that is

22   applicable in this case, and give you further

23   instructions.

24      How about moving the lectern over so the jury

25   won't have to strain to hear me.

125

1           (The lectern was moved.)

2           THE COURT:  Before I charge you on the points

3      of law, let me make a few general comments.  First

4      of all, it's been a very short trial.  It's been

5      short because you only had three -- I believe

6      three witnesses.  You came to this courtroom this

7      morning around 11 o'clock.  We got the jury

8      struck; got you impaneled as the jury to try this

9      case; took witnesses before lunch, and then came

10     back and had two witnesses, as I recall -- and you

11     recall the witnesses -- after lunch.

12          Now, you are not to allow the shortness or

13     the brevity of the trial to influence you one way

14     or the other.  Now, the case was short only

15     because you had a limited number of witnesses, and

16     the testimony was not voluminous or it was not

17     very convoluted.  It was direct testimony;

18     testimony of what the witnesses said they saw,

19     etc.

20          Now, so the same standard that you would use

21     in a one-day trial or a two-day trial or two-month

22     trial, is the same standard of law that you would

23     use in this case.  And that is, the defendant

24     comes to court presumed to be innocent; that

25     presumption attends him, and stays with him up

1    until the State meets its burden of proving his

2    guilt beyond a reasonable doubt. And if the State

3    has done that, you should convict the defendant.

4    If the State has not done that, then you should

5    acquit the defendant.

6        Now, this is an important case. It's

7    important to the people of the State of Alabama,

8    because the State of Alabama says this defendant

9    has broken the law. And if you break the law and

10   if you're guilty of it, you must be punished.

11       It's important to the defendant because his

12   liberty is at stake. So it's an important case,

13   and you are not to allow the shortness of the

14   trial influence you one way or the other.

15       Now, what is the burden of proof in this

16   case? The burden of proof in this case is beyond

17   a reasonable doubt. First of all, before we

18   actually called witnesses to testify, or before

19   the witnesses -- the lawyers gave their opening

20   statements, I told you what was not evidence in

21   the case.

22       I told you the opening statement was not

23   evidence in the case. The opening statement was

24   just the time for the lawyers to tell you what

25   they expect the evidence to show.

127

1    I told you questions by the lawyers was not

2    evidence in the case.  I went further to tell you

3    that closing argument -- what you have just

4    heard -- was not evidence in the case.  The

5    closing argument is the time for the lawyers to

6    argue and to try to persuade you which side should

7    prevail.

8    Now, if either one of the lawyers said

9    anything in closing argument that you don't recall

10   that being the testimony; that's not accurate

11   based on your recollection of the testimony or the

12   document -- from the documents, then you disregard

13   what the lawyers say, because what the lawyers say

14   in closing argument is simply argument.

15   On the other hand, if either one of the

16   lawyers said anything that you recall being

17   accurate; that's the way you recall the testimony,

18   then you take that -- not because the lawyers said

19   it, but because that's the way you recall the

20   evidence and the testimony from the witness stand.

21   Now, some of you have used the phrase beyond

22   a reasonable doubt.  Some of you have defined it

23   in your own way.  And some, perhaps, think you

24   know what it means, and the way you define it.

25   Well, let me state to you how the law defines

128

1    beyond a reasonable doubt, which is the burden of

2    proof in any criminal case in this country,

3    whether it be at the state -- the city level, the

4    county level, the state level, or the federal

5    level.

6        Beyond a reasonable doubt. The law says a

7    doubt which would justify an acquittal, that is,

8    not guilty, must be an actual doubt; not just a

9    mere possible doubt. A reasonable doubt is not a

10   mere guess or surmise, and it is not a capricious

11   doubt.

12       If after considering all the evidence in the

13   case, you have an abiding conviction of the truth

14   of the charge, then you are convinced beyond a

15   reasonable doubt, and it would be your duty to

16   convict the defendant.

17       On the other hand, if after considering all

18   the evidence in the case, you do not have an

19   abiding conviction of the truth of the charge,

20   then you are not convinced beyond a reasonable

21   doubt, and it would be your duty to acquit the

22   defendant.

23       The law says evidence which merely gives rise

24   to a surmise, conjecture, or suspicion of guilt is

25   not sufficient in order to base a conviction upon

1    it.  Also, a reasonable doubt which entitles an

2    accused to an acquittal is not a mere fanciful,

3    vague, conjectural or speculative doubt, but a

4    reasonable doubt arising from the evidence and

5    remaining after a careful consideration of the

6    testimony; such as reasonable, fair-minded,

7    conscientious men and women would entertain under

8    all of the circumstances.

9        You will observe, ladies and gentlemen of the

10   jury, that the State is not required to convince

11   you of the defendant's guilt beyond all doubt, but

12   simply beyond a reasonable doubt.  Beyond a

13   reasonable doubt means beyond a doubt for which a

14   reason may be given.  Now, that is the way the law

15   defines reasonable doubt.

16       And it's not my duty or my business to offer

17   any commentary or editorialize on the definition.

18   Except, I'll go further to say this:

19       When you came in here in here morning in the

20   venire, and I asked those questions, and then at

21   the end I asked did anyone know of any reason why

22   you should not be selected to serve on this jury,

23   I received no negative answer.  Then from that,

24   you 12 were impaneled to do what?  To find the

25   truth.  That's all you're after.

130

1          The parties are facing, the State of Alabama?

2     No.  The defendant, Carlos Williams?  No.

3          Where is the truth?  And when you go into the

4     jury room, you use the standard of proof, beyond a

5     reasonable doubt.  If the truth is that the

6     defendant was in possession of crack or this

7     cocaine, then you should convict him.  If the

8     truth is that he was not in possession of the

9     cocaine, then you should acquit him.

10          Now, the law says the defendant comes to

11     court presumed to be innocent, and that

12     presumption stays with him.  The law says this

13     defendant is presumed innocent in this case, and

14     that presumption attends him until such time as

15     the State by the evidence in the case proves his

16     guilt beyond a reasonable doubt.

17          This presumption of innocence is evidence in

18     the case, and is to be considered by you as

19     evidence along with the rest of the evidence in

20     the case.  The presumption goes with the defendant

21     to your verdict unless the evidence convinces you

22     beyond a reasonable doubt of the proof of each and

23     every element necessary to show guilt.

24          Now, I don't try to add anything to the

25     definition of reasonable doubt.  But let me say

131

1 this:  When you go into the jury room, one of the

2 things you have to do, after you -- I assume you

3 sift through it and discuss the evidence among

4 yourselves, and then before you can come together

5 with others, because whatever verdict you reach

6 must be a unanimous verdict -- before you can come

7 together with 11 persons, you have to be satisfied

8 one way or the other for yourself.

9  So once you think that have you done as I

10 suggest, once you think you have done all you need

11 to do with the evidence, and you set it out there

12 on the table before you, figuratively speaking,

13 and you step back and you say, ask yourself, is

14 the defendant guilty?  And if what naturally

15 springs back from your conscience and mind is that

16 he is, and I have no doubt that he is, then you

17 should convict the defendant.

18  If you do the same with the evidence,

19 figuratively speaking, set it out there on the

20 table before you and you step back, and ask

21 yourself is the defendant guilty, and if what

22 springs naturally back in your conscience and mind

23 is that I doubt that he is, and you can assign a

24 reason for the doubt, then, of course, you have

25 not been convinced beyond a reasonable doubt, and

132

1    it would be your duty to acquit the defendant.

2        Now, the defendant is charged with possession

3    of cocaine.  Section 13A-12-212 of the Code of the

4    State of Alabama reads as follows:

5        "A person commits the crime of unlawful

6    possession of a controlled substance if except as

7    otherwise authorized, he possesses a controlled

8    substance enumerated in Schedules I through V."

9        Now, I charge you affirmatively that cocaine,

10   crack cocaine as it's commonly called, is

11   schedule -- cocaine is covered in Schedule I

12   through V.  It's a controlled substance.

13       Now, what are we talking about in this case?

14   The defendant -- There are two ways to possess

15   any -- anything.  In this case it was either

16   actual possession; that means, you have it in your

17   hands; or constructive possession.

18       The law says a conviction relies on either

19   one; actual possession or constructive possession.

20   What is -- As I stated, actual possession is where

21   you have to object or you have what it is in

22   contention, you either have it on your person or

23   you have it in your hand.

24       Constructive possession.  Constructive

25   possession simply means this:  That the item is in

133

1    a place, in a position where you have dominion or

2    control over it if you so desire to possess it.

3        Let me go further and explain to you how the

4    law defines it.  The law says, possession, whether

5    actual or constructive, has the following three

6    attributes:  Actual or potential for physical

7    control; (2) intention to exercise dominion; and

8    external manifestations of intent and control.

9        When constructive possession is relied on,

10   the prosecution must prove beyond a reasonable

11   doubt that the accused had knowledge of the

12   presence of the controlled substance.  This

13   knowledge may be inferred from the accused's

14   exclusive possession, ownership, and control of

15   the premise.  When the accused is not in exclusive

16   possession of the premise, however, this knowledge

17   may not be inferred unless there are other

18   circumstance tending to buttress this inference.

19       So, ladies and gentlemen, you are to take all

20   of the circumstances attendant in this case; the

21   totality of the circumstances in this case, in

22   deciding whether or not the defendant had

23   constructive possession of this cocaine in

24   question.

25       I charge you where the defendant is in

134

1     knowing and exclusive possession of an automobile,

2     neither his presence in the automobile nor his

3     close proximity to the controlled substance is

4     sufficient in itself or when taken together to

5     establish knowledge, element necessary to support

6     a finding of constructive possession.

7          So you are to take -- You are to take the

8     total circumstances of the case. The law says you

9     don't leave your common sense out here in the jury

10    room with you -- out here in the courtroom when

11    you go into the jury room and start your

12    deliberations.

13         I have -- One of the things you must decide

14    is the credibility of the witnesses. You heard

15    the witnesses as they testified. You must decide

16    whether you believe them. There's a reason for

17    the witness being near you, and you being near the

18    witness without anything separating you. One

19    reason is so you can hear what the witnesses say.

20    But, you know, that's not the only reason. I can

21    put the witness in the jury room and a microphone

22    out here, and you could hear what the witnesses

23    say.

24         Equally important is so that you can observe

25    the witness; so you can observe they as them

1    testify, and you can look at them and take into

2    consideration, the law says, their demeanor on the

3    stand; whether or not the witness was eager to

4    testify, reluctant to testify; showed any bias,

5    showed any interest, in evaluating their

6    testimony.  I call it reading the person.

7         In the course of a day or at least sometime

8    in a week, you come in contact with persons -- it

9    could be your husband, your wife, your children, a

10   total stranger; and you can look at them and you

11   have to decide whether you believe that they're

12   telling you at that time.

13        You're doing the same thing in this

14   courtroom.  You're observing the witness and

15   deciding who you believe and who you do not

16   believe.  You decide the credibility of the

17   witnesses.

18        So the law says if you find a witness

19   credible or some part of his testimony is not

20   credible or not worthy of belief, you can

21   disregard that testimony -- that part of the

22   testimony as not credible or not worthy of belief

23   as long as you do not discard any witness'

24   testimony arbitrarily or capriciously.

25        Whatever verdict you reach, it must be a

136

1   unanimous verdict; that is, all 12 of you must

2   agree.

3        I have prepared the verdict form for you.

4   One of the first things you might want to do when

5   you go into the jury room is select one among you

6   to be the foreperson.  That person has no more

7   duty or authority in the jury room than the rest

8   of you, except when you reach -- to move the

9   deliberations along in an orderly fashion, and

10  when you reach a verdict, the person -- foreperson

11  must print his or her name here; sign it here;

12  file -- date it here, and mark the verdict that

13  you reach.

14       If the State has proved the defendant guilty

15  beyond a reasonable doubt of possession of

16  cocaine, it will be, "We, the jury, find the

17  defendant, Carlos Williams, guilty of possession

18  of cocaine, a controlled substance."

19       If not, "We, the jury, find the defendant,

20  Carlos Williams, not guilty of possession of

21  cocaine, a controlled substance."

22       When you reach a verdict, knock on the door,

23  and I'll be here to accept your verdict.  In the

24  meantime, both doors must remain closed.  They're

25  not locked.

137

1      You're not to use any dictionary, reading

2   material, novels or anything else to get

3   definitions or anything to help you reach a

4   verdict.  If you have a cell phone, please turn it

5   off; you cannot call out, and you cannot receive a

6   call.

7      You may retire to the jury room, and do not

8   begin your deliberations until I send all the

9   exhibits in with you.

10      You may retire.

11          (The jury retired to the jury room, after

12          which the following proceedings were

13          held, outside of their presence:)

14      THE COURT:  What says the State?  Is the

15   State is satisfied?

16      MR. FOREMAN:  Yes, sir.

17      THE COURT:  Is the defense satisfied?

18      MR. BLEVINS:  Your Honor, could I just

19   quickly take a look at the verdict form.  I

20   haven't seen it.

21      THE COURT:  Yes.

22          (The verdict form was tendered to Mr.

23          Blevins.)

24      MR. BLEVINS:  Yes, sir; satisfied.

25      THE COURT:  All right.  Thank you.

138

1            All right.  Leave the exhibits alone.  Ms.

2       Gordon is going to take care of them.

3            Ms. Gordon, take them in.

4                 (After the exhibits and the verdict form

5                 were tendered to the jury, they began

6                 their deliberations.)

7                      *    *    *

8                 (The jury was placed in the box, and the

9                 following proceedings were held in their

10                presence:)

11           THE COURT:  All right.  Who is the

12      foreperson?

13           THE FOREPERSON:   I am.

14           THE COURT:  Has the jury reached a verdict?

15           THE FOREPERSON:   Yes, sir.

16           THE COURT:  Will you pass it up, please?

17                (The verdict form was tendered to the

18                Court.)

19           THE COURT:  "We, the jury, find the

20      defendant, Carlos Williams, guilty of possession

21      of cocaine, a controlled substance.  Signed,

22      Gwendolyn P. Bell.  May 2nd, 2006."

23           I'll poll the jury to see whether or not the

24      verdict is unanimous.

25           Is this your verdict, Ms. Bell?

139

```
 1              THE FOREPERSON:   Yes, sir.

 2              THE COURT:  Is this your verdict, ma'am?

 3              A JUROR:  Yes.

 4              THE COURT: Your verdict, sir?

 5              A JUROR:  Yes.

 6              THE COURT:  Is this your verdict, ma'am?

 7              A JUROR:  Yes.

 8              THE COURT: Your verdict, sir?

 9              A JUROR:  Yes, sir.

10              THE COURT: Your verdict, sir?

11              A JUROR:  Yes, sir.

12              THE COURT:  Your verdict, ma'am?

13              A JUROR:  Yes, sir.

14              THE COURT:  Your verdict, ma'am?

15              A JUROR:  Yes.

16              THE COURT:  Your verdict, ma'am?

17              A JUROR:  Yes.

18              THE COURT:  Your verdict, ma'am?

19              A JUROR:  Yes.

20              THE COURT:  Your verdict, ma'am?

21              A JUROR:  Yes.

22              THE COURT: Your verdict, sir?

23              A JUROR:  Yes.

24              THE COURT:  Let the record show that the

25       verdict is unanimous.  I understand from Mr. Bob
```

140

1    Merrill that the -- the court administrator, that

2    you're now free for the rest of the week.  I know

3    you want to stay with me, but you can go down to

4    the clerk's office and get paid that big check

5    they have for you.

6        The clerk's office is -- the Circuit Clerk's

7    office is the middle office there on the first

8    floor.  You can go down and get paid.

9        Mr. Williams come forward, please.

10           (After the jury was dismissed, the

11            following proceedings were held, outside

12            of their presence:)

13       THE COURT:  The jury having found you guilty

14   of possession of cocaine --

15       Of course, Blevins, he's going to have to

16   make a new bond because once he's found guilty,

17   the surety is off that bond.

18       What was his bond?

19       MR. FOREMAN:  10,000, Your Honor.

20       THE COURT:  He's going to have to make a new

21   bond.  See, once found guilty, the surety is off

22   if he's going to be sentenced to 10 years or more.

23   So he goes to jail, but I'll leave the bond at 10,

24   and let him make a new bond.

25       MR. BLEVINS:  Yes, sir.

141

1    THE COURT:  I'll sentence him on May the

2    19th.  May the 19th.  Take him to jail.

3        $10,000 bond.  I'm not going to raise the

4    bond.  And he can make the new bond.  Okay?

5        Thank you.

6        May 19th.  The Court adjudicates you guilty

7    on the jury verdict of possession of cocaine.

8            (The proceedings in the above-referenced

9            case were concluded.)

10               *    *    *

11           (The following proceedings occurred

12           before the Honorable Charles Price,

13           Presiding Circuit Court Judge, in regard

14           to the above-styled cause, commencing on

15           Friday, May 19, 2006:)

16    THE COURT:  Carlos Williams.

17           (The defendant steps forward; counsel

18           present.)

19    THE COURT:  All right.  Mr. Williams, you're

20    here for sentencing.  You were convicted of

21    possession of a controlled substance.

22        Anything to say why the sentence and law

23    should not now be imposed against you?

24    MR. BLEVINS:  Judge, may I just simply point

25    out a couple of inaccuracies in the presentence

Denise L. Gordon
Official Court Reporter
(334) 832-1330

1   report?

2       THE COURT:  Sure.

3       MR. BLEVINS:  Looking at page 2 of the

4   report, Details of the Offense, for instance, one,

5   the report indicates Carlos Williams was involved

6   in the reverse drug deal.  We don't think the

7   evidence at trial beared (sic) that out.

8       Looking at page 3, second paragraph, it says,

9   "Williams, the driver of the vehicle, observed the

10  officers and fled at a high rate of speed."

11      The Court may recall the evidence was

12  Cleveland Jointer fled at a high rate of speed in

13  that vehicle.  That was not Carlos Williams.

14      Also, on page 3, "On Probation at Arrest,"

15  the report indicates, yes.  We contend he was not

16  on probation at the time of the arrest.  And --

17      THE COURT:  Well, the question had not been

18  resolved at the time of his arrest, whether he was

19  on probation or not.  But that's what the record

20  shows that the probation office had.  I

21  understand.

22      MR. BLEVINS:  And that's all we have, Judge.

23      THE COURT:  Well, I don't know how you can --

24  Yeah, and I'll take that into consideration.  But

25  your first contention that he was not involved in

143

1    the reverse -- what do you call it -- drug buy, I

2    don't know how you cannot say that.  I mean, he

3    was all involved in it; I mean, up to the hip.  So

4    I'll take that into consideration, what you've

5    said.

6         What says the State?

7         MR. FOREMAN:  Judge, the State would move to

8    invoke the Felony Habitual Offender Act.  I have a

9    certified on two convictions from Montgomery

10   County.  However, it appears that there may be

11   another conviction from Texas for possession of

12   marijuana.

13        THE COURT:  Well, I'll take the two.

14        MR. FOREMAN:  I move to invoke the two, then.

15        THE COURT:  All right.  Go ahead.

16        MR. FOREMAN:  Out of Montgomery County,

17   CC-01-857, possession of marijuana in the first

18   degree and failure to affix a tax stamp.

19        MR. BLEVINS:  Judge, you'll notice on page 4

20   of the presentence report, that's incorrectly

21   cited as a conviction for trafficking in illegal

22   drugs.

23        THE COURT:  Well, how about taking that

24   document.

25             (Document tendered to Mr. Blevins.)

1      MR. BLEVINS:  He admits to these.

2      THE COURT:  Okay.  The State's motion to

3   invoke the two prior felonies is hereby granted.

4   Anything to say before the sentence and law is

5   imposed against you?

6           (No response.)

7      THE COURT:  Hearing nothing, the Court

8   sentences you to 15 years in the penitentiary.

9      The Court -- $2,000 drug assessment; $100

10  Department of Forensic Sciences; court costs; $500

11  victim compensation.

12     And you're retained, right?

13     MR. BLEVINS:  Yes, sir.

14     THE COURT:  All right.  That's it.  Okay.

15     MR. BLEVINS:  Your Honor, could we give oral

16  notice of appeal at this time; ask the Court to

17  set an appeal bond.

18     THE COURT:  $20,000 appeal bond.

19     MR. BLEVINS:  I'm sorry, Judge, how much?

20     THE COURT:  $20,000 appeal bond.

21     MR. BLEVINS:  Thank you.

22     THE COURT:  All right.  Thank you.

23     Jason Earl Hicks.

24     Wait a minute.  Hold it.  Bring him back.

25     THE COURT:  Plus driver's license suspended

145

```
1     for 6 months.
2            MR. FOREMAN:  That's right.
3            THE COURT:  Driver's license suspended for 6
4     months.
5            The Court instructs the Commissioner of the
6     Board of Corrections if you receive any money
7     during the time you're in the penitentiary,
8     instruct his staff to deduct 50 percent of that
9     money to pay into the clerk's office to be paid,
10    victim compensation, Department of Forensic
11    Sciences, drug assessment, and court costs.
12           Any money that is owed once you're released
13    from the penitentiary, the Court reduces it to a
14    civil judgment in favor of the State of Alabama.
15           Okay.  Thank you.
16               (The proceedings in the above-referenced
17               case were concluded.)
18                        *    *    *
19           CERTIFICATE OF COMPLETION
                  REPORTER'S TRANSCRIPT
20
21    _____
      TO:  The Clerk of the Court of Criminal Appeals
22         P.O. Box 301555
           Montgomery, AL  36130-1555
23
      Criminal Appeals Case Number  CR-05-1585
24
      Carlos Raymond Williams v. State of Alabama
25    On appeal from the Circuit Court of Montgomery County
```

Denise L. Gordon
Official Court Reporter
(334) 832-1330

146

1    CC-2006-141

2    Notice of Appeal Date: 5/19/06
     _____

3

4

5        I, Denise L. Gordon, certify that I have this date
     completed and filed with the clerk of this trial court
6    via electronic copy, an original and three copies of a
     true and correct transcript of all proceedings in the
7    above-referenced case and were reported by me and were
     specifically designated by the appellant for inclusion
8    on the Reporter's Transcript Order.  The page number
     appearing in the upper right-hand corner of this
9    certificate is the last page of my portion of the
     transcript in this case.

10

11   DONE THIS THE 4TH DAY OF SEPTEMBER, 2006.

12
                              /s/Denise L. Gordon
13                            Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25